# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BRUTYN, N.V.,

       Plaintiff,

     v.                                   Case No. 04-CV-0527

ANTHONY GAGLIANO CO., INC.,
ANTHONY "TONY" GAGLIANO,
MICHAEL GAGLIANO, and
RICHARD J. KOLLAUF,

       Defendants.

---

## DECISION AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

### I. PROCEDURAL AND FACTUAL BACKGROUND

This action was commenced on June 3, 2004, when the plaintiff Brutyn, N.V. ("Brutyn") filed a complaint in the Eastern District of Wisconsin alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the Wisconsin Organized Crime Control Act ("WOCCA"), and the Perishable Agricultural Commodities Act ("PACA"), as well as claims of fraud, breach of contract, and breach of constructive trust/fiduciary duty.

On May 5, 2005, the defendants in this action filed a motion for judgment on the pleadings, in which they seek dismissal of the RICO, WOCCA, fraud, and breach of constructive trust/fiduciary duty claims. On June 1, 2005, the plaintiff filed its response to the defendants' motion, along with the declaration of Marko Stegeman. In its response brief, the plaintiff asked the court to consider Stegeman's declaration and also to treat the defendants' motion as a motion for summary judgment. In their reply brief the defendants treated their motion for judgment on the pleadings as having been

converted to a motion for summary judgment, and consequently, this court shall treat it as a motion for summary judgment.

Thus, currently pending before the court is the defendants' motion for summary judgment on the plaintiff's RICO, WOCCA, fraud, and constructive trust/fiduciary duty claims. The motion is fully briefed and is ready for resolution. For the reasons which follow, the defendants' motion for summary judgment will be granted.

Typically, in accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), a motion for summary judgment would be accompanied by a set of proposed findings of fact. However, given the procedural route that the defendants' motion has taken, this court has not required either party to file proposed findings of fact. Rather, the defendants, in their reply brief, stated that with respect to this now-converted motion for summary judgment, the defendants do not dispute any of the facts alleged by plaintiff. A review of the plaintiff's statement of facts in its response brief as well as the complaint reveal that the following are the material and undisputed facts (except where noted) that are relevant to the disposition of the defendants' motion for summary judgment.

Plaintiff alleges that Tony Gagliano, alone or with Michael Gagliano and Richard Kollauf, "willfully and wantonly devised a scheme, plan, or artifice to defraud plaintiff" through a "pattern of proscribed business practices" that injured plaintiff's business. The "proscribed business practices" include, but are not limited to, numerous violations of PACA, mail and wire fraud, and fraudulent claims concerning the quality or condition of produce delivered as well as fraudulent transportation claims. Plaintiff also alleges that other produce shippers have been similarly victimized. At its core, however, this lawsuit concerns a dispute over several shipments of perishable

2

agricultural commodities sold by plaintiff to defendants. Plaintiff alleges that the defendants fraudulently filed transportation claims regarding shipments of produce and also fraudulently took unauthorized and unjustified deductions on at least twenty of Brutyn's invoices. Moreover, the plaintiff alleges that the defendants failed to pay, even in part, for at least six shipments of produce.

The Anthony Gagliano Company, Inc. ("Gagliano"), is a PACA licensee and is an "enterprise," as that term is defined in 18 U.S.C. § 1961, engaged in interstate commerce. Defendant Anthony "Tony" Gagliano ("Tony") is Gagliano's sole shareholder and CEO. Michael Gagliano, is the Vice President of Gagliano. It is disputed whether Richard Kollauf is an officer of the organization because, despite having been held out as Gagliano's Chief Financial Officer and General Counsel, defendants' answer denies that he is a corporate officer.

All of the sales that are the subject of this lawsuit were made between October of 2002 and October of 2003. Prior to July 1, 2003, Brutyn's former sales representative, Marko Stegeman, was responsible for the Gagliano account and he communicated with Tony via fax, telephone, and e-mail. On July 1, 2003, Xavier Brutyn ("Xavier") assumed responsibility for the Gagliano account. Xaiver also negotiated sales exclusively with Tony via telephone, fax, and/or e-mail. The defendants used the U.S. postal service to send their partial payments on the disputed invoices and most of the communications between plaintiff and defendants were via fax or e-mail.

On July 9, 2003, plaintiff delivered a full truckload of "Red Vine" tomatoes, sold by Stegeman, to defendants' warehouse in Milwaukee. Prior to departure from Brutyn's warehouse in New Jersey, the driver made a notation on the bill of lading that 4 pallets (out of 21) were leaning due to moisture on the bottom layer, with each layer containing 10 cartons. Gagliano made no mention of the extent of damage on this shipment nor did Gagliano mention that any repacking or

3

dumping had occurred until nearly one month after the shipment arrived. On August 6, 2003, the defendants e-mailed digital pictures to Brutyn showing the "damaged" tomatoes. Brutyn alleges that these pictures do not represent the condition of the load at the time the truck doors were opened in Milwaukee. Rather, Brutyn alleges that when the shipment arrived at the warehouse, the defendants deliberately "staged" the pictures in an effort to defraud plaintiff into believing that there had been transportation damage to nearly 30% of the load. Brutyn also alleges various other fraudulently filed transportation claims, described in detail in its complaint, which are substantially similar to the one described above.

On June 13, 2003, Brutyn delivered a shipment of yellow bell peppers, red bell peppers, and orange bell peppers to Gagliano. And, on June 17, 2003, Brutyn delivered a second shipment of bell peppers to Gagliano. Both shipments were sold f.o.b. at Chicago's O'Hare airport where they were accepted by the defendants and transported from the airport. Brutyn alleges that the invoices entered into its accounting system by Stegeman reflect the prices for which he agreed to sell the peppers and that those prices reflect the adjustments to prices pursuant to the "pepper deal" Stegeman provided for Gagliano. The defendants took deductions totaling $15,587.50 on these two shipments, which Brutyn alleges are unlawful, unauthorized, and fraudulent. Gagliano, on the other hand, alleges that these deductions were taken pursuant to "settlements" (i.e. further price adjustments) as agreed to by Stegeman. Plaintiff also alleges approximately twenty-six other unlawful, unauthorized, and fraudulent deductions taken by Gagliano, also outlined in detail in plaintiff's complaint, which are substantially similar to the one described above. Gagliano responds by stating that any deductions taken were either authorized by Stegeman or warranted because of damaged product.

4

However, not all of Stegeman's invoices are in dispute, as Brutyn received two checks in full payment of two of its invoices prepared by Stegeman. Allegedly, those full payments lead Brutyn to believe that the defendants intended to correctly pay plaintiff's invoices, and thus, Brutyn continued to ship produce to Gagliano. After Stegeman's departure from Brutyn, plaintiff alleges that Gagliano encouraged Brutyn to continue providing shipments of produce with promises of future long-term business as well as promises to furnish documents that purportedly would show the "settlements [i.e. deductions] made by Marko" to the various invoices in dispute. Moreover, evidenced by the numerous e-mails and faxes attached to the complaint, Brutyn attempted to obtain documents from the defendants, which purportedly would have resolved the issues regarding the disputed shipments and the deductions taken by the defendants. It also appears that, at least to a certain extent, the parties entered into negotiations regarding the disputed invoices. However, as evidenced by this litigation, those negotiations were not successful.

On October 8th and 9th of 2003, Corry Brutyn telephoned Tony requesting immediate payment of all overdue invoices. Tony sent a reply e-mail promising payment before noon the next day. However, no payment was made the next day and it was not until October 23, 2003 (one day after Brutyn made its last delivery to Gagliano on October 22, 2003) that Brutyn received Gagliano's check. Furthermore, the check revealed that Gagliano took deductions on Brutyn's invoices in the amount of $32,025.75.

At the time the last shipment of produce was made to Gagliano, on or about October 23, 2003, Xaiver and plaintiff's representative, Dirk Keijer ("Keijer"), were in the United States for an annual industry trade show. Keijer had arranged a meeting with Tony, scheduled for October 29th in Milwaukee, to negotiate all of the outstanding invoice issues and questions between the parties.

That meeting was delayed and finally cancelled when Xaiver and Keijer learned that Tony and his employees had lied about his being out of the country in order to avoid the scheduled meeting regarding the disputed invoices as well as other outstanding issues.

On November 12, 2003, plaintiff sent the PACA "Notice to Preserve Trust Benefits" required to preserve its rights as a PACA trust creditor. After a few e-mails were exchanged between the parties, Tony sent the following e-mail to Xaiver and Keijer:

> To whom it may concern et al: My reply, while you state that it is lacking in faith, is unfortunately unsupported by your statements you blatantly make. I certainly, we certainly have no reason to hide behind anyone. As far as my being out of the country, it is unfortunate that you would stoop so low as to the tactics you have taken upon yourself and your representative Dirk whatever his name is to determine that fact. DO NOT EVER PUT ANY DEMANDS ON ME OR ANYONE HERE; I PERSONALLY DO NOT CAVE IN TO YOU OR ANYONE ELSE. If you have anything worthwhile to discuss for your "invoices" You know where to contact us. We have a representative in a country very close to you who will be most happy to meet you face to face to deal with your attitude about demanding whatever you may demand. If necessary the foreign office is only one hour away from you, and if need be it is not a problem to pay all of you a visit, whether that be in Spain, Holland or Belgium. You won't have to find us; we will find you!!!! If you have nothing positive to indicate; we will not even answer you unless it to assist you on your invoices. By the way you have very strong tones in your statements; MAKE SURE AND POSITIVE WE DO NOT RECEIVE THIS SORT OF COMMUNICATION. I would imagine that the best way to put it is that it could be interpreted in a very negative way which does not bode well for YOU. Your favorite customer.

The next communication between Tony and Xaiver did not occur until March 12, 2004 when Tony called Xavier on his cell phone and told him that "it [was] not good that Dirk Keijer [was] speak[ing] bad about [him] with other people." Tony also made reference to the March 11, 2004 bombings in Madrid and indicated that he hoped that no one from Brutyn's Spain office was hurt.

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

7

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. DISCUSSION

Gagliano moves for summary judgment on Brutyn's RICO, WOCCA, common law fraud, and constructive trust/breach of fiduciary duty claims. This court will address each in turn.

#### A. The RICO Claim

Brutyn alleges that Tony Gagliano ("Tony") has violated section 1962(c) of RICO, or, that Tony, in concert with Richard Kollauf and Michael Gagliano, has conspired to violate RICO in violation of section 1962(d). ("Pl.'s Resp. to Def.'s Mot. for J. on the Pleadings ("Pl.'s Br.") at 16.)

8

Although it appears that the plaintiff has plead in the alternative, this court will consider Brutyn's claims under both section 1962(c) and section 1962(d) (conspiracy to violate section 1962(c)).

Under the civil remedies portion of the RICO statute, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c). Section 1962(c) provides, in pertinent part, that it "shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). Section 1962(d) in turn provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [section 1962]." 18 U.S.C. § 1962(d). Thus, "the elements of a civil RICO violation consist of '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

"Racketeering activity" is defined to include, among other things, any act which is indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. §1343 (wire fraud) or 18 U.S.C. § 1951 (federal extortion law). 18 U.S.C. § 1961(1). The "pattern" element of a civil RICO violation, however, is not so easily defined. RICO itself simply defines a pattern as at least two acts of racketeering activity, otherwise known as predicates, within a ten-year period. 18 U.S.C. § 1961(5). Yet, although "'two acts [of racketeering activity] are necessary, they may not be sufficient'" to establish a pattern. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237 (1989) (quoting *Sedima*, 473 U.S. at 496 n.14 (Powell, J., dissenting)). In other words, two predicate acts "does not so much

9

define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *Id.*

Relying upon the common understanding of the word "pattern" as an "arrangement or order of things or activities,"and the legislative history of the RICO statute, the Court, in *H.J., Inc.,* reasoned that "a pattern is not formed by 'sporadic activity'"and that RICO liability will not attach simply because a person has committed "'two widely separated and isolated criminal offenses.'" *Id.* at 238-39 (quoting the Congressional Record). Simply stated, to prove a "pattern of racketeering activity" a civil RICO plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* (emphasis in original). By providing more specificity to the amorphous "pattern" requirement, the Court, in *H.J. Inc.*, sought "to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law." *Midwest Grinding*, 976 F.2d at 1022.

Thus, to prove a pattern of racketeering activity, a civil RICO plaintiff must meet the so-called "continuity plus relationship" test. To satisfy the "relationship prong" the predicate acts must have "'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and [can not be] isolated events.'" *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). The "continuity prong" can be established by showing either a "closed-ended" or "open-ended" scheme. To satisfy the continuity element in a closed-ended scheme, the plaintiff must prove a course of criminal conduct extending over a "substantial period of time," which has now, as its label suggests, come to a close. *Id.* at 242. The underlying reason behind the finding of continuity is that "the duration and repetition of the criminal

10

activity carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding*, 976 F.2d at 1022-23. Yet, in some cases the plaintiff may not be able to establish a closed-ended scheme because the acts only occurred over a short period time. In those "open-ended" cases, continuity may be established if the predicate acts, by their very nature, pose "a specific threat of repetition extending indefinitely into the future," or "are [proven to be] part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242.

So far, then, to establish civil RICO liability Brutyn must show (1) it was injured (2) by reason of (3) a violation of section 1962(c). To establish a violation of section 1962(c), Brutyn must show that Tony, alone, or in concert with the other individual defendants, conducted the affairs of Gagliano through a pattern of racketeering activity, in this case, mail fraud, wire fraud, or extortion.

As aforementioned, to establish a "pattern of racketeering activity," Brutyn must first establish the predicate acts of mail fraud, wire fraud, and extortion, and then show that the predicate acts meet the "relationship plus continuity" test. This court will engage in the former inquiry first, as there can be no "pattern of racketeering activity" if there is no racketeering activity in the first place.

### 1. Mail Fraud and Wire Fraud

The gist of Brutyn's mail fraud and wire fraud claims is that Gagliano entered into contracts for produce with Brutyn with no intention of paying the full price for certain shipments. In furtherance of this scheme to defraud, Gagliano allegedly made false statements regarding deductions provided on certain invoices, false statements that documentation substantiating these deductions would be provided to Brutyn, false statements regarding freezing damage and transportation damage,

11

filed false transportation claims, and "staged" pictures of damaged tomatoes to substantiate the false transportation claims.

The elements of mail fraud under 18 U.S.C. § 1341 are: "(1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003). A necessary element of mail fraud, then, is an intent to defraud, and it is here that Brutyn's mail fraud and wire fraud claims fail. The Seventh Circuit has noted that, consistent with concerns regarding the breadth of the mail fraud statute, this circuit has made clear that "all the [mail fraud] statute punishes is *deliberate* fraud." *Emery v. Am. Gen. Fin. Inc.*, 71 F.3d 1343, 1346 (7th Cir. 1996) (emphasis in original). "'Intent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another.'" *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004) (quoting *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002)); *see also  Perlman v. Zell*, 185 F.3d 850, 854 (7th Cir. 1999) ("The word 'fraud' in the mail fraud statute means deliberate, material misrepresentations."). Moreover, "[b]reach of contract is not fraud; only making a promise with the intent not to keep it deserves that epithet." *Perlman*, 185 F.3d at 852.

In support of its mail fraud claims, plaintiff has provided evidence establishing that Gagliano, in fact, did not pay the full amount due on certain invoices and, in fact, made promises that documentation substantiating the deductions would be sent to Brutyn and no such documentation was ever received by Brutyn. (Pl.'s Br. at 28-30.) Additionally, plaintiff has provided evidence establishing that Gagliano, on at least one other occasion (and according to allegations made in other

12

pending cases, numerous occasions) has taken unauthorized deductions on another producer's invoices and was ordered by the USDA to make reparations to that producer. (Pl.'s Br. at 22.) To be sure, if (and this turns out to be a big if) Brutyn could establish that the defendants devised a scheme to defraud, in which Gagliano would enter into contracts with no intention of paying full price for the produce, and that the defendants utilized the mails in furtherance of this scheme, then Brutyn might arguably have demonstrated a triable issue on its mail fraud/wire fraud claims.[1]

Brutyn, however, has provided no evidence showing that, at the time Gagliano entered into the contracts, it had no intention of paying full price, nor has Brutyn provided any evidence showing that, when Gagliano took deductions on certain invoices, filed transportation claims, or reported damage to lots of tomatoes, Gagliano did so with "an intent to deceive." In order to withstand the defendant's motion for summary judgment, Brutyn must provide some evidence that, if believed by a reasonable jury, would show that, at the time Gagliano entered into the contracts with Brutyn, Gagliano had no intention of paying the full price. Brutyn cannot simply rely on the fact that, in the end, Gagliano did not pay the full price on all of its invoices, to show that at the time this promise was made Gagliano never intended to keep it. As the Seventh Circuit stated in *Corley*, "[f]raud requires much more than simply not following through on contractual or other promises. It requires a showing of deception at the time the promise is made. A subsequent breach, although consistent with deceptive intent is not in and of itself evidence of such an intent." 388 F.3d at 1007.

---

[1] It was the plaintiff who, by requesting that the court consider matters outside the pleadings, converted the defendants' motion for judgment on the pleadings into a motion for summary judgment. Moreover, the plaintiff at no time has sought relief from this court under Fed. R. Civ. P. 56(f).

With no evidence that Gagliano intended to pay anything other than what was due on its invoices when it entered into its contracts with Brutyn, and with no evidence that Gagliano intended to deceive or trick anyone when it made statements regarding damaged produce or filed transportation claims, Brutyn has not shown there to be a triable issue of fact on the elements of mail fraud. *See Emery*, 71 F.3d at 1348 (stating that "[s]tate of mind is crucial in a case of criminal fraud"). This is because, with no evidence of intent to defraud, no reasonable jury could find that the defendants committed mail fraud.[2]

With regard to Brutyn's wire fraud claims, the elements of wire fraud under 18 U.S.C. § 1343 "directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme." *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995). For all of the foregoing reasons Brutyn's wire fraud claims must also fail. This is because with no evidence of intent to defraud, no reasonable jury could find that the defendants committed wire fraud.

All of this boils down to one conclusion. Brutyn has failed to produce sufficient evidence from which a reasonable jury could find that mail and/or wire fraud were committed by the defendants. And, without there being sufficient evidence to prove mail and/or wire fraud, it follows that there can be no violation of RICO, at least in so far as such RICO violation would be predicated on mail and/or wire fraud.

---

[2] Moreover, it is highly unlikely that the series of commercial transactions at issue in this case were the result of a "scheme to defraud." This is because, after the first transaction, Brutyn had "an absolute out" that would have protected it from any further injury. *See Corley*, 388 F.3d at 1007 (stating that it is very unlikely that a scheme to defraud provides "an absolute out that would protect [a person] from injury"). Indeed, after the first "unauthorized" deduction, Brutyn had the ability to unilaterally terminate the business relationship, and thus, the "fraud."

14

*2. Hobbs Act Violations*

Brutyn also claims that an e-mail sent by Tony to Xaiver, as well as a telephone conversation between Tony and Xaiver, constitute violations of the Hobbs Act, 18 U.S.C. § 1951, and thus, constitute predicates under RICO. Specifically, Brutyn alleges that the following e-mail, sent by Tony to Xaiver on November 12, 2003, constitutes a threat of physical violence.

> To whom it may concern et al: My reply, while you state that it is lacking in faith, is unfortunately unsupported by your statements you blatantly make. I certainly, we certainly have no reason to hide behind anyone. As far as my being our of the country, it is unfortunate that you would stoop so low as to the tactics you have taken upon yourself and your representative Dirk whatever his name is to determine that fact. DO NOT EVER PUT ANY DEMANDS ON ME OR ANYONE HERE; I PERSONALLY DO NOT CAVE IN TO YOU OR ANYONE ELSE. If you have anything worthwhile to discuss for your "invoices" You know where to contact us. We have a representative in a country very close to you who will be most happy to meet you face to face to deal with your attitude about demanding whatever you may demand. If necessary the foreign office is only one hour away from you, and if need be it is not a problem to pay all of you a visit, whether that be in Spain, Holland or Belgium. You won't have to find us; we will find you!!!! If you have nothing positive to indicate; we will not even answer you unless it to assist you on your invoices. By the way you have very strong tones in your statements; MAKE SURE AND POSITIVE WE DO NOT RECEIVE THIS SORT OF COMMUNICATION. I would image that the best way to put it is that it could be interpreted in a very negative way which does not bode well for YOU. Your favorite customer.

(Def's Br. at 11).

Brutyn also alleges that a telephone conversation between Tony and Xaiver on March 12, 2004, in which Tony stated that "it [was] not good that Dirk Keijer [was] speak[ing] bad about [him] with other people," and also made reference to the March 11, 2004 bombings in Madrid, constitutes a threat of physical violence. Moreover, on September 20, 2005, the plaintiff filed the declaration of Richard Kusian ("Kusian"), a former sales manager for Nature's Way Farms, as additional evidence in support of its opposition to the defendant's motion for summary judgment. After

15

testifying in a case, similar to this one, pending before the USDA, *Nature's Way Farms, Inc. v. Anthony Gagliano Company, Inc.*, Kusian agreed to offer his declaration in this case.[3]  In his declaration, under penalty of perjury, Kusain relates the following:

> On one Saturday morning when all of this was going on [Kusian was negotiating with Tony Gagliano over the price of a shipment of tomatoes, and payment of the disputed invoice], Tony Gagliano called me on my cellular phone to discuss the load.  I was in my car with my wife, Dee.  When the call came in I pulled over and put Tony on the speaker phone so that my wife could hear what I was going through with him.  Tony was ranting and raging about the shipment but I told him I needed to pay Mike Matsie [Nature's Way's grower] who was putting a lot of pressure on me.  When Tony heard that he exploded and screamed something along the lines of "Tell Mike Matsie that he'd better back off" and something like "Doesn't he know that I can easily send someone out there to break his legs if he's not careful?"

(Kusian Dec. at 4, ¶ 15.)  This court will consider whether these alleged statements made by Tony constitute a threat of physical violence and otherwise constitute a violation of the Hobbs Act.

The Hobbs Act, 18 U.S.C. § 1951, states that:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section–

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. §1951.

---

[3]  Although the defendant argues that this court should not consider Kusian's declaration because the filing of the declaration was procedurally improper, given the procedural route this case has taken, the court will consider this evidence.

With respect to "fear-induced" Hobbs Act violations, "the victim's fear must be reasonable." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cty., Ill.*, 424 F.3d 659, 671 (7th Cir. 2005). And, the victim's "bald assertion[s] that [he was] intimidated [will] not carry the day." *Id.* at 672. The only evidence presented by Brutyn that the "victims" were intimidated in this case are their own assertions that they were. And, with respect to the telephone conversation between Tony and Xavier, there is documentary evidence (a March 13, 2004 e-mail) tending to show that, immediately after the conversation, Xaiver was not intimidated whatsoever. Brutyn argues that "[t]he phone call was nothing more than a depraved reminder that Mr. Gagliano's connections in Sicily were capable of the same type [of] cold-blooded terrorism that occurred in Madrid the day before." (Pl.'s Br. at 35-36.) Xaiver's e-mail, however, which was written the morning after the telephone conversation, does not reference any "fear" or "intimidation." Rather, it states that "[Tony] spoke to me like there was not[hing] wrong with our relationship. Again he was acting [like] mister 'nice guy.'" (Compl., Ex. C at 12.) In light of such evidence, no reasonable jury could find that Xavier's expressed "fear" was reasonable.

But, what about Xavier and Dirk's fear stemming from the November 12, 2003 e-mail? Taking the facts in a light most favorable to the plaintiff, a reasonable jury could find that Xavier and Dirk's expressed fear based upon the alleged threat made in the November 12, 2003 e-mail, was reasonable. Furthermore, assuming Kusain was intimidated by Tony's alleged threat of physical violence (although no such assertion is included in Kusain's declaration), a reasonable jury could find that Kusain's fear was also reasonable.

However, even assuming that on these two occasions, threats of physical violence were made, in order for these "threats" to constitute acts of extortion, and thus, predicates under RICO, Gagliano

17

must have obtained Brutyn's property as a result of the threats. In *Scheidler v. National Org. of Women, Inc.*, 537 U.S. 393, 404 (2003), the Supreme Court made clear that, in the context of civil RICO claims, mere disruption or interference with an individual's, or an entity's, property rights is not sufficient to constitute extortion. In *Scheidler*, even though the respondents, anti-abortion protestors, "achieved their ultimate goal of 'shutting down' a clinic that performed abortions, such acts did not constitute extortion because petitioners did not 'obtain' respondents' property." *Id.* The Court reasoned that "petitioners may have deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets, but they did not acquire any such property." *Id.* "To conclude that such actions constituted extortion would effectively discard the statutory requirement *that property must be obtained from another*, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion." *Id.* at 405 (emphasis added).

Similarly, although Gagliano may have sought to deprive Brutyn of its right to collect a disputed debt, Gagliano never acquired any property as a result of the threats, and thus, the threats did not constitute acts of extortion. Perhaps in recognition of this fact, in its brief Brutyn argues that, in essence, what Gagliano did constitutes "an attempt to extort," and that an attempt to extort is also a crime under the Hobbs Act. (Pl.'s Br. at 37.) The gist of Brutyn's argument is that Gagliano made the threats in an effort to interfere with, and potentially persuade Brutyn to halt, Brutyn's effort to collect a disputed debt. Even though Gagliano was unsuccessful in its efforts (because Brutyn continued to attempt to collect the disputed debt) Gagliano's efforts constituted an attempt to extort. However, if Gagliano was unsuccessful in its efforts, this begs the question of how Brutyn was

18

injured. In other words, even if Brutyn's attempted extortion argument could carry the day, Brutyn can not show that it was injured "by reason of" this attempted extortion.

Be that as it may, this court need not spend much time on Brutyn's alleged Hobbs Act violations. This is because, even if Gagliano violated the Hobbs Act on these two occasions, these two acts alone do not constitute a "pattern of racketeering activity," as a matter of law. To establish a pattern of racketeering activity, a plaintiff must show continued criminal activity (or the threat thereof) and a relationship between the predicate acts. *H.J. Inc.*, 492 U.S. at 239. Relatedness of the alleged Hobbs Act violations does not pose a problem here. Both of the threats complained of were for the alleged purpose of attempting to dissuade companies from collecting disputed debts they had with Gagliano. Thus, it would appear that the evidence presented in support of Brutyn's claim meets the relationship test. *See id.* at 240 (stating that predicate acts are related if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events").

However, Brutyn has not presented sufficient evidence to satisfy the continuity requirement. The "continuity prong" can be established by showing either a "closed-ended" or "open-ended" scheme. To satisfy the continuity element in a closed-ended scheme, the plaintiff must prove a course of criminal conduct extending over a "substantial period of time," which has now, as its label suggests, come to a close. *Id.* at 242. In those "open-ended" cases, continuity may be established if the predicate acts, by their very nature, pose "a specific threat of repetition extending indefinitely into the future," or "are [proven to be] part of an ongoing entity's regular way of doing business." *Id.*

19

The Seventh Circuit analyzes continuity under a multifactor test, in which the court considers: "(1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries." *Roger Whitmore's Auto. Servs., Inc.*, 424 F.3d at 673. Analysis of the various factors in this case reveals that Brutyn has not shown closed-ended continuity. Both the number of predicate acts (two), and number of victims (two), is small. Likewise, the length of time over which they were committed is short, to wit, a few months,[4] and there does not appear to be another unrelated "scheme" in which Gagliano engaged. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement." *H.J. Inc.*, 492 U.S. at 242. Two acts occurring within a few months of each other is not enough to demonstrate a closed period of continuity. *See Roger Whitmore's Auto. Servs., Inc.*, 424 F.3d at 673 (stating that although the Seventh Circuit has not "employed a bright-line rule for how long a closed period must be to satisfy continuity, we have not hesitated to find that closed periods of several months to several years did not qualify as 'substantial' enough to satisfy continuity").

Nor has Brutyn established open-ended continuity. To reiterate, open-ended continuity may be established if the predicate acts, by their very nature, pose "a threat of repetition extending indefinitely into the future," or "are [proven to be] part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. Brutyn has presented no evidence that these acts "are part of Gagliano's regular way of doing business." Brutyn simply asserts that Gagliano has "devised a plan, scheme, or artifice to defraud plaintiff . . . that [has] injured plaintiff's business and that continue[s]

---

[4] The e-mail was sent on November 12, 2003, and, although the specific date of the alleged threat made via telephone to Kusian is not provided in his declaration, it appears that the alleged threat occurred sometime between "late 2003 and early 2004." (Kusian Dec. at 3, ¶3.)

to have a serious, negative affect on foreign and interstate commerce." (Compl. at ¶11.) Yet, these "[c]onclusory and unsupported allegations" do not establish open-ended continuity. *Roger Whitmore's Auto. Servs., Inc.*, 424 F.3d at 674; *see also Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 783 (7th Cir. 1994) ("A threat of continuity cannot be found from bald assertions such as '[Brutyn] continues [its] racketeering activities.'").

In sum, even if Brutyn were to prove its claimed Hobbs Act violations, it has not satisfied the continuity prong. Thus, it has not presented evidence of a RICO pattern sufficient to survive summary judgment on its section 1962(c) claim. As for Brutyn's section 1962(d) claim, because this court has concluded that, for all of the foregoing reasons, Brutyn has presented neither evidence of a pattern of racketeering nor evidence establishing that there was an agreement to participate in a pattern of racketeering activity, Brutyn's section 1962(d) claim must also fail.

*B. The WOCCA Claim*

Brutyn alleges that Gagliano violated the Wisconsin Organized Crime Control Act ("WOCCA") by engaging in the predicate acts discussed above, by violating section 943.20(1)(b) of the Wisconsin Statutes, by engaging in theft by fraud, a violation of section 943.20(1)(d), and by violating 18 U.S.C. § 2314 (interstate transportation of property obtained by fraud). The WOCCA, Wis. Stat. § 946.83(3), is Wisconsin's counterpart to 18 U.S.C. §1962(c), and provides that "[n]o person employed by, or associated with, any enterprise may conduct or participate, directly or indirectly, in the enterprise through a pattern of racketeering activity." Wis. Stat. § 946.83(3). "Racketeering activity," includes, among other things, any activity specified in 18 U.S.C. § 1961(1), thus including, mail fraud, wire fraud, and violations of the Hobbs Act, as well as violations of Wis.

21

Stat. § 943.20.[5] Wis. Stat. § 946.82(4). A "pattern of racketeering activity" is defined as "engaging in at least 3 incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics." Wis. Stat. § 946.82(3). For all of the foregoing reasons, this court concludes that Gagliano did not violate the WOCCA based upon the alleged predicate acts of mail fraud, wire fraud, and Hobbs Act violations. This court will address the alleged violation of § 943.20(1)(b), the alleged violation of § 943.20(1)(d), theft by fraud, and the alleged violation of 18 U.S.C. § 2314.

Section 943.20(1)(b) provides, in pertinent part, that whoever

By virtue of his or her . . .employment, or as trustee, having possession or custody of money . . . intentionally uses, transfers, conceals, or retains possession of such money . . . without the owner's consent, contrary to his or her authority, and with intent to convert to his or her own use or to the use of any other person except the owner [violates this section]. . . . A refusal to deliver any money or a negotiable security, instrument, paper or other negotiable writing, which is in his or her possession or custody by virtue of his or her office, business or employment, or as trustee or bailee, upon demand of the person entitled to receive it, or as required by law, is prima facie evidence of an intent to convert to his or her own use within the meaning of this paragraph.

Wis. Stat. § 943.20(1)(b). Brutyn argues that "the defendants' refusal to pay over [the] PACA trust funds due to the plaintiff after demand is prima facie evidence of their intent to unlawfully convert to their own use and benefit plaintiff's property." (Pl.'s Br. at 38.) However, even assuming Gagliano was a trustee for the disputed funds under PACA, Gagliano's refusal to deliver the money

---

[5] Specifically, section 946.82(4) defines "racketeering activity" to include "commission of any of the felonies specified in . . . 943.20(3)(bf) to (e). Wis. Stat. § 946.82(4). Section 943.20(3)(c) states that "[w]hoever violates sub. (1): [i]f the value of the property exceeds $10,000, is guilty of a Class G felony." Thus, because the value of the property at issue exceeds $10,000, if Gagliano violated section 943.20(1) it has engaged in "racketeering activity" under WOCCA.

22

to Brutyn does not constitute prima facie evidence of intent, as defined under the statute, because it is disputed whether Brutyn was entitled to receive that money. *See* § 943.20(1)(b) (stating that [a] refusal to deliver any money . . . which is in his or her possession . . . as trustee . . . upon demand of the person *entitled to receive it* . . . is prima facie evidence of an intent to convert to his or her own use within the meaning of this paragraph") (emphasis added). Because whether Brutyn was entitled to receive the money is in dispute, Brutyn has not provided prima facie evidence of intent to convert the money, and without any other evidence establishing Gagliano's intent to convert the money to its own use, Brutyn's claim that Gagliano violated § 943.20(1)(b) must fail.[6] This is because with no evidence of intent to defraud, no reasonable jury could find that the defendants violated § 943.20(1)(b).

Section 943.20(1)(d) provides, in pertinent part, that whoever

[o]btains title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made [violates this section]. "False representation" includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme.

---

[6] Brutyn relies upon *State v. Wolter*, 85 Wis. 2d 353, 270 N.W.2d 230 (Wis. Ct. App. 1978) in support of its argument that it has established prima facie evidence of intent to convert the funds. However, *Wolter* is distinguishable from this case. In *Wolter*, the defendant, the prime contractor of the Granville Road project secured a construction loan from Heritage Savings & Loan Association ("Heritage"). *Id.* at 360; 270 N.W.2d at 234. Pursuant to the construction loan, "[a]s certain stages of construction were completed [on the project] and after inspection of the site by Heritage personnel, [the defendant] would receive a draw from Heritage to pay subcontractors and materialmen." *Id.* at 361; 270 N.W.2d at 234. "Heritage did not authorize the use of draw monies for any purpose other than paying the subcontractors and materialmen on the Granville Road project." *Id.*; 270 N.W.2d at 235. The defendant, however, did not use the "draws" to pay the subcontractors or materialmen but rather, used the money to pay corporate creditors. *Id.*; 270 N.W.2d at 235. Thus, in *Wolter* there was no dispute as to who was entitled to the funds, as it was provided in the loan agreement that draws on the account were only to be used for the payment of the subcontractors and materialmen working on the project.

23

Wis. Stat. § 943.20(1)(d). Brutyn argues that the "defendants' willful and wanton refusal to pay for or even account for six loads of produce accepted in interstate commerce constitutes theft by fraud in Wisconsin," that is, a violation of section 943.20(1)(d). (Pl.'s Br. at 38.) One of the elements of a violation of section 943.20(1)(d) is that the defendant made the false representation with an "intent to defraud." Brutyn has provided no evidence establishing that, when Gagliano entered into the contracts for the six loads of produce, it did so with the intent of defrauding Brutyn by never paying for the produce. Brutyn can not simply rely on the fact that, in the end, Gagliano allegedly did not pay for the six loads of produce. Rather, Brutyn must provide some evidence that, if believed by a reasonable jury, would show that, at the time Gagliano entered into the contracts with Brutyn, it had no intention of ever paying for the produce. With no evidence of intent to defraud, no reasonable jury could find that the defendants violated § 943.20(1)(d).

To establish a violation of 18 U.S.C. § 2314, the plaintiff must prove that the defendant transported fraudulently obtained property in interstate commerce, and that the defendant did so with fraudulent intent. 18 U.S.C. § 2314; *United States v. Crabtree*, 979 F.2d 1261, 1268 (7th Cir. 1992). Thus, one of the elements of a violation of 18 U.S.C. § 2314 is that the defendant possess a "fraudulent intent." Brutyn has provided no evidence establishing that, at the time Gagliano entered into the contracts with Brutyn, it had no intention of paying the full price for all of the produce. With no evidence of intent to defraud, no reasonable jury could find that the defendants committed a violation of 18 U.S.C. § 2314.

Because Brutyn has failed to produce evidence from which a reasonable jury could find that Gagliano violated section 943.20(1)(b) or (d), or 18 U.S.C. § 2314, Brutyn has failed to establish any

24

predicates which could constitute a pattern of racketeering under WOCCA. Thus, Brutyn's WOCCA claim cannot survive summary judgment.

### C.  Common Law Fraud Claim

Plaintiff alleges that for all of the foregoing reasons Gagliano engaged in common law fraud. Under Wisconsin law, to prove common law fraud, the plaintiff is required to establish that:

> (1) the defendants made a representation of fact, not opinion; (2) the representation of fact was untrue; (3) the defendants knew the representation was untrue or made it recklessly without caring whether it was true or false; (4) the representation was made with intent to deceive and induce plaintiff to act upon it to plaintiff's damage; and (5) the plaintiff believed such representation to be true and relied on it.

*Grove Holding Corp. v. First Wis. Nat'l Bank*, 803 F.Supp. 1486, 1503 (E.D. Wis. 1992).  One of the elements of common law fraud is that the representation be made with "an intent to deceive." Brutyn has provided no evidence establishing that, when Gagliano entered into the contracts with Brutyn, it had no intention of paying full price for all of the produce.  Nor has Brutyn provided evidence establishing that, when Gagliano took deductions on certain invoices,  filed transportation claims, or reported damage to lots of tomatoes, Gagliano did so with an "intent to deceive."  In order to withstand the defendant's motion for summary judgment, Brutyn must provide evidence from which a reasonable jury could find that at the time Gagliano entered into the contracts with Brutyn, it had no intention of paying full price for all of the produce.  Because Brutyn has presented no evidence of an intent to deceive, its common law fraud claim must fail.  This is because with no evidence demonstrating an "intent to deceive," no reasonable jury could find that Gagliano engaged in common law fraud.

25

### D. Constructive Trust/Breach of Fiduciary Duty Claim

Brutyn alleges that "pursuant to the constructive trust, Gagliano was . . . the statutory trustee for the benefit of plaintiff with respect to the assets constituting the trust res." (Compl. at 38, ¶ 142.) Moreover, Brutyn alleges that Gagliano's

> failure to fully and promptly pay for all of the perishable agricultural commodities accepted and received by it in interstate and foreign commerce indicate that the individual defendants failed to maintain plaintiff's assets in the manner required by the constructive trust, and may have knowingly diverted and/or converted plaintiff's assets, including the trust res, to their own use.

(Compl. at 38, ¶ 142.) Brutyn, however, has not presented any evidence establishing the circumstances under which a constructive trust arose, nor has it responded with evidence to refute the defendant's motion for summary judgment on this claim. While Gagliano may be a "trustee" under PACA,[7] Brutyn has presented no evidence, and no argument for that matter, establishing that "pursuant to a constructive trust, Gagliano was the statutory trustee." Thus, because Brutyn has failed to provide any evidence or argument in support of its constructive trust/breach of fiduciary duty claim, it will not survive the defendant's motion for summary judgment. *See Corley*, 388 F.3d at 1006 (stating that the court need not comb the record for facts to support the plaintiff's argument nor is it necessary to conduct the legal research necessary to construct an argument from those facts).

### IV. CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, this court finds that Brutyn has failed to present sufficient evidence from which a reasonable jury could find in its favor on its RICO, WOCCA, common law fraud, and constructive trust/fiduciary duty claims. Such being the case,

---

[7] Brutyn's claims under PACA, count five ("common law breach of contract/failure to make prompt payment under PACA") and count six ("to enforce PACA trust/breach of fiduciary duty") were not challenged by the defendant's motion for summary judgment.

those claims cannot survive the defendants' motion for summary judgment. Thus, the defendants' motion for summary judgment will be granted and the plaintiff's RICO, WOCCA, common law fraud, and constructive trust/breach of fiduciary duty claims will be dismissed.

There is one final housekeeping matter to address. On July 15, 2005, i.e., after the briefing on the defendants' motion for judgment on the pleadings/summary judgment was completed, the plaintiff filed a motion to compel production of documents. As of September 8, 2005, that motion was fully briefed. However, on October 3, 2005, the plaintiff filed a motion seeking an order extending the discovery cut-off. That motion was granted on October 13, 2005.

In support of its motion of October 3, 2005, the plaintiff stated *inter alia* as follows:

> While awaiting the Court's rulings, plaintiff has suspended formal discovery but continues to investigate its claims. Plaintiff is eager to move this case forward, however, until the parties have the benefit of the Court's rulings on the pending motions, counsel for plaintiff believes that it would not be in the plaintiff's best interest to devote energy and resources conducting discovery until it is known exactly what claims remain in the case - counsel's concern about the delays in the case are compounded by the fact that: (1) to the plaintiff, a Belgium corporation that has never been involved in litigation here or in its own country, the entire discovery process is an entirely foreign concept; and (2) the plaintiff remains unpaid for thousands of dollars worth of perishable agricultural produce delivered to and accepted by the defendants more than two years ago.

> . . . .

> Plaintiff would like to resume formal discovery and depose the defendants as soon as possible however it is hesitant to do so at this time. First, plaintiff believes until there is an order establishing the claims that will be tried, defendants would likely object to many of the questions counsel would pose on oral examination and that disputes would most likely arise and require judicial intervention. Second, plaintiff believes that were it to depose defendants at this time, it is likely that leave of court would be required to depose one or more of the defendants a second time. And finally, prior to deposing the defendants, plaintiff would like to review whatever documents defendants may be ordered to produce in connection with its Rule 34 request for production.

(Pl.'s Mot. at 2-3.)

As the plaintiff sagely observed that it would, this court's decision on the defendants' motion for judgment on the pleadings/summary judgment has no doubt altered the landscape of this case, in terms of that which might be reasonably discoverable in support of the plaintiff's surviving claims. Thus, in order to afford the plaintiff the opportunity to reassess the position it has taken in its motion to compel, the court will deny that motion without prejudice. If the plaintiff wishes to renew that motion, bearing in mind this court's decision on the defendants' motion, it may do so. In the event that the plaintiff does wish to renew the motion, plaintiff's counsel should identify in writing those documents of which she continues to seek production. The court will then schedule a hearing on the matter. No further briefing will be necessary.

**NOW THEREFORE IT IS ORDERED** that the defendants' motion for judgment on the pleadings, which has been converted to a motion for summary judgment, be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that Counts 1 through 4 of plaintiff's complaint be and hereby are **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that the plaintiff's Motion to Compel Production of Documents be and hereby is **DENIED WITHOUT PREJUDICE**;

**SO ORDERED** this _29th_ day of November 2005, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge


28