# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BRUTYN, N.V.,

       Plaintiff,

    v.                                 Case No. 04-C-527

ANTHONY GAGLIANO CO. INC.,
ANTHONY GAGLIANO,
RICHARD J. KOLLAUF and
MICHAEL GAGLIANO,

       Defendants.

## DECISION AND ORDER

During the week of January 29, 2007, a trial to the court was conducted in this action. Three witnesses testified on behalf of the plaintiff: Xavier Brutyn ("Xavier"), Marko Stegeman ("Stegeman"), and Corry Brutyn ("Corry"). Three witnesses testified on behalf of the defendants: Anthony "Tony" Gagliano ("Tony"), Richard Alsum ("Alsum"), and Richard Kollauf ("Kollauf"). The parties were thereafter afforded an opportunity to submit written memoranda in support of their respective positions on the plaintiff's claims. Having now considered the testimony, the exhibits and the submissions of the parties, the court issues its decision in this action. This decision shall constitute the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under a federal statute, to wit, the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a, *et seq*. ("PACA"). Venue is proper under 28 U.S.C. § 1391. The parties have consented to United

States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

Brutyn is a foreign corporation with a principal place of business in Oostende, Belgium. Brutyn is engaged in the sale of perishable agricultural commodities in the United States and Europe. The Anthony Gagliano Company, Incorporated ("AGCI") is a regional distributor of perishable agricultural commodities that purchases and sells wholesale quantities of perishable agricultural commodities. AGCI has a principal place of business in Milwaukee, Wisconsin. AGCI is and was a PACA licensee at all times relevant to this action.

Tony Gagliano is and was the President of AGCI at all times relevant to this action. Richard J. Kollauf was the Chief Financial Officer for AGCI at all times relevant to this action. Michael Gagliano is and was the Vice-President of AGCI at all times relevant to this action. Marko Stegeman was the sales representative who handled AGCI's account on behalf of Brutyn until his departure from Brutyn on June 30, 2003. After Stegeman's departure from Brutyn, Xavier Brutyn became the sales representative who handled AGCI's account on Brutyn's behalf until the companies ceased doing business in October of 2003.

This action involves a dispute regarding the amount due, if any, on numerous shipments of perishable agricultural commodities, primarily tomatoes, sold by Brutyn to AGCI. As to the majority of the transactions at issue, Brutyn alleges that AGCI violated the "full and prompt" payment provision of PACA as set forth in 7 U.S.C. § 499b(4), as well as common law. Specifically, Brutyn alleges that the prices set forth on its invoices were "fixed" prices and that AGCI took unauthorized deductions on the amount due on certain invoices and also failed to pay the amount due on other invoices in their entirety. As to a number of the transactions at issue, Brutyn alleges that AGCI made

2

"false or misleading" statements for a "fraudulent purpose" and that Brutyn relied upon such "false" statements when granting AGCI deductions on the amount due on certain invoices in violation of 7 U.S.C. § 499b(4).

The main dispute between the parties is whether the shipments of produce at issue in this case were sold on a "fixed" price basis or an "open price" basis. Brutyn argues that substantially all of the transactions at issue in this action were pre-sold on a fixed price basis as set forth on Brutyn's invoices. According to Brutyn, price modifications would only occur if unforeseen circumstances arose, i.e., ACGI took more produce than the amount originally agreed upon, there was a transportation damage claim, or there was a quality problem with the produce. AGCI argues that all of the shipments of produce at issue in this action were sold on an "open price" basis. It is undisputed that the lemons transactions were sold on an open price or "price after sale" basis.

At trial, Xavier Brutyn, Tony Gagliano, and Marko Stegeman all testified regarding the price agreement between the parties on the transactions at issue in this case. Simply put, I find Marko Stegeman's testimony regarding the pricing agreement between Brutyn and AGCI to be the most credible. There was nothing about Marko Stegeman's testimony which leads me to believe that he was less than candid in any fashion. Indeed, I found his testimony on both direct and cross-examination to be consistent. And, although Marko Stegeman may have some general interest in the outcome of this case, he does not have a deep personal interest in its outcome. Indeed, in June of 2003, Brutyn terminated its relationship with Marko Stegeman. With regard to his termination, Stegeman testified that he visited Spain and was told that Brutyn no longer required his services as of July of 2003. (Tr. at 711). Stegeman did testify that "[he and Brutyn] both decided that [they] would not continue [their relationship]," however, he also testified that, "[f]rom [his] point of view

3

that was not a very gentle like way to terminate it." (Tr. at 711.) Thus, it is doubtful that Stegeman has any strong sense of loyalty to Brutyn such that he would feel compelled to testify in such a way that would benefit Brutyn's position in this litigation.

At trial, Stegeman testified that he had worked as a salesman in Europe for two other produce exporters before he went to work for Brutyn. Stegeman had one or two customers in each of the major markets in the United States to whom he sold produce and AGCI was one of his customers. When Stegeman went to work for Brutyn in October of 2002, he brought with him some of his customers, one of which was AGCI. On direct examination, Stegeman testified as follows regarding the typical pricing agreement between the parties: "[b]efore we load the products in Europe we discuss with the customers the prices, and we discuss the quantities if they're interested. And if they're interested we load the containers and with the agreed prices." (Tr. at 564.) On direct, Stegeman was asked to review Brutyn invoice #2003174, and was asked by the court:

What sort of an agreement did you have with Mr. Gagliano on this particular invoice?

THE WITNESS: That we would ship these quantities and these goods at those indicated prices.

THE COURT: How did you come to that agreement with him?

THE WITNESS: Over the telephone verbally.

(Tr. at 564.)

On cross-examination, Stegeman testified as follows:

Q. Now, you testified in terms of the pricing here. I believe you said that there was indicated prices. That's how you billed these files; is that correct?

A. That's not correct.

4

Q. On direction examination you didn't say that these were indicated prices for these

files?

A. To which files are you referring?

Q. All the files.

A. All the files? No, all the tomato files and pepper files they were firm prices, and

the lemon files were in kind of open price. The lemons.

(Tr. at 712.) On cross-examination, Stegeman also testified that the price of $9 reflected on invoice #2003189 was:

> the price that [he] determined when [the produce] leaves [Europe]. But when it arrives, you know, in this case, for example, if nothing would have happened, if Mr. Gagliano would not have taken extra products, it would still be a firm deal at $9. But we also sent some products that we have not sold yet. And then also we approached customers to take extra products and, therefore, we had to change our targeted price in that case. . . . It's targeted because it's finalized when it arrives. I say like it's a targeted profit position and when it arrives it can change because if there's a problem condition or if we need to make changes with the customer.

(Tr. at 732.)

I am persuaded that the pricing agreement between Brutyn and AGCI on the shipments of

produce at issue in this case (excluding the shipments of lemons) was as follows: the produce was

sold on a "fixed" price basis, that is, before the produce was loaded in Europe, Brutyn quoted AGCI

a price per carton and AGCI agreed to such price. However, to the extent that a problem with the

produce was discovered by AGCI upon receipt of the produce, i.e., transportation damage or a quality

problem, and Brutyn was promptly notified of such problem, or other unforeseen circumstances

arose, i.e., Brutyn wanted AGCI to take more produce, the "fixed" price may be modified.

5

Furthermore, I am satisfied that this general pricing agreement was not altered when Marko Stegeman departed from the Brutyn organization and Xavier Brutyn took over the AGCI account.

AGCI argues that Stegeman's testimony on cross-examination reveals that the pricing agreement between the parties was on an "open" or "price after sale" basis. I disagree. To be sure, Stegeman's testimony reveals that there were price modifications made after the produce arrived in the United States based upon various circumstances. This type of pricing agreement seems perfectly reasonable given that the goods are perishable produce and, thus, transportation damage or a quality problem may arise while the produce is in transit from Europe to Milwaukee. Yet, simply because price modifications were made based upon various unforeseen circumstances, it does not follow that all of the transactions (again, except for the lemons) were conducted on an "open price" or "price after sale" basis. In the produce industry, the terms "open price" or "price after sale" assumes that the parties will negotiate a price after the goods are sold by the buyer of the produce. *Sucasa Produce v. A.P.S. Marketing, Inc.*, 59 Agric. Dec. 421, 424, 2000 WL 33420232, *3 (2000). And, in no part of Stegeman's testimony did he assert, or even imply, that all of the sales were done on an "open" price or "price after sale" basis, i.e., that AGCI and Brutyn would agree on a price after AGCI sold the produce to its customers.

However, simply because I have concluded the general pricing agreement to be as stated above, it does not follow that Brutyn has satisfied its burden of proving the particular prices on each of the disputed transactions. That having been said, the court will now address each transaction at issue in this case, and determine what, if anything, Brutyn is owed on each transaction.

6

*A. Transactions*

**1. Invoice #2003236**

This transaction involves a sale of 3150 cartons of cluster tomatoes at a sales price of $8.25 per carton, for a total invoice price of $25,987.50.[1] (Ex. 18.) The terms of the sale were "delivered Milwaukee," and thus, Brutyn was responsible for transport from New Jersey to Milwaukee. (Ex. 18.) Brutyn's trucker noted that "4 pallets were leaning due to moisture" before the truck left Brutyn's New Jersey warehouse. (Ex. 16-9.) AGCI's receiving report shows that this shipment arrived in Milwaukee on July 9, 2003 and that: "909 cases that are caved in & crushed, all tomatoes in the damaged cases are split, bruised, or crushed . . . 5 [pallets] were restacked, the other 16 [pallets] will need to be restacked . . . pictures were taken upon request." (Ex. 16-6; Ex. 19.) Based upon the damage to the tomatoes, Brutyn issued an invoice reflecting a credit to AGCI in the amount of $4,296.51. (Ex. 18.) Brutyn then sought to recover such amount from the trucking company. On August 18, 2003, Brutyn faxed AGCI's account of sale and the AGCI receiving report to its transportation agent, T.H.Weiss, requesting that a claim be made on Brutyn's behalf against the trucker for the damage caused during transit to Milwaukee. (Ex. 17.)

Brutyn argues that the photographs of this shipment of tomatoes when it arrived at AGCI's warehouse on July 9, 2003 were "staged," and that there was actually little or no damage to this shipment. (Tr. at 117-119.) Thus, Brutyn argues that AGCI was not entitled to the $4,296.51 credit that it initially granted to AGCI on this shipment. I disagree. I have no reason to disbelieve Rick

---

[1] Exhibits 16 and 16-10 are also invoices related to this shipment. However, both of those invoices are marked as invoice #2003222 instead of invoice #2003236. (Tr. at 129-33.)

7

Alsum's testimony regarding this shipment. (Tr. at 936-39.) Simply stated, I am not persuaded that the photographs were "staged," and I am satisfied that Brutyn is not owed anything on this shipment.

## 2. Invoice #2003250

This transaction involves the sale of 1200 cartons of cluster tomatoes at a sales price of $11.00 per carton, for a total invoice price of $13,200.00. (Ex. 32-6.) AGCI's receiving report shows that this shipment arrived at AGCI's facility in Milwaukee on July 3, 2003 and that 36 boxes were crushed. (Ex. 32-3.) The airline carrier, American Airlines, also documented damage to the load: "36 boxes damaged . . . tomatoes stacked/crushed on bottom." (Ex. 32-8.) AGCI paid $9,603.00 on this invoice, which equals 1,164 cartons at $8.25 per carton. (Ex. 32-6.) AGCI did not pay for the 36 boxes that were damaged by the airline. (Ex. 32-6.)

Xavier testified that he sent this load of tomatoes via air freight to cover a shipment that was sent via sea container that was delayed in transit. (Tr. at 210.) Xavier further testified that he agreed to modify the contract price from $11.00/carton to $9.00/carton based upon Tony's representation that he had to deliver the tomatoes to a supermarket at $9.00. (Tr. at 211.) Xavier also testified that AGCI should have paid $9.00 per carton for the 1,164 cartons and that AGCI should have paid something for these 36 damaged boxes because "it's not possible that [AGCI] dumped every tomato [in each of the 36 boxes]." (Tr. at 216.) Brutyn argues that it is owed $3,597.00 on this invoice; that is, Brutyn argues that AGCI should have paid the total invoice price of 1200 cartons at $11.00 per carton. Brutyn argues that Tony misrepresented to Xavier that he had to sell these tomatoes to a supermarket at $9.00 per carton, and that Xavier relied upon this misrepresentation when he agreed to the deduction to $9.00 per carton. (Pl.'s Br. at 24-25.)

8

In my opinion, Brutyn has not satisfied its burden of proving that there was a fixed price of $11.00 per carton on this transaction. First, on direct examination, Xavier testified that he was never told that the tomatoes had to be priced at $8.25 to cover the supermarket ad. (Tr. at 211.) However, on cross-examination, Xavier testified that these tomatoes were originally priced at $8.25 when they were to be shipped via boat. (Tr. at 478.) Second, invoice #2003250 reflecting the sales price of $11.00 per carton was not faxed to AGCI until fifty-one (51) days after the produce arrived. (Ex. 32-6.) Third, Brutyn sent a total of three different invoices to AGCI on this transaction: the first, reflecting a price of $11.00 per carton; the second, reflecting a price of $9.00 per carton; and the third, reflecting a price of $9.00 per carton and also reflecting a deduction of $324 ($9.00 x 36 damaged boxes). (Ex. 32-6; Ex. 1021, Ex. 1022.) In sum, in light of the conflicting testimony and conflicting invoices, Brutyn has failed to satisfy its burden of proving that there was a fixed price agreement of $11.00 per carton on this particular transaction.

Nor am I persuaded that Tony "misrepresented" his deal with the supermarket for a "fraudulent purpose" in violation of 7 U.S.C. § 499b, thus entitling Brutyn to the total invoice price of $13,200.00 (1200 cartons at $11.00/carton). Brutyn argues that, simply because AGCI sold these tomatoes for a "net price" of $11.25, Tony must have been lying with fraudulent purpose when he supposedly said that he had a deal with a supermarket at $8.25. I am not so persuaded. Furthermore, I am satisfied that the price of $8.25 per container was a reasonable price based upon the return on the product. *Sucasa Produce*, 59 Agric. Dec. at 424.

Nevertheless, I am also persuaded that Brutyn is owed $297.00 (36 boxes at $8.25/carton) on this invoice. Although AGCI may have incurred additional costs repacking/resorting of the tomatoes in the boxes damaged by the airline, AGCI should pay for all 1200 cartons of tomatoes

9

because it appears that AGCI sold all 1200 cartons of tomatoes shipped under this invoice. (Ex. 1006 at 2.)

### 3. Invoice #2003261

This transaction involves a sale of 3,090 cartons of tomatoes at a sales price of $7.50 per carton. (Ex. 34-14.) AGCI paid a total of $22,402.50 on this invoice, and thus, paid $7.25 per carton, rather than $7.50 per carton. Tony Gagliano testified that he was originally quoted $7.25 per carton on this transaction. According to Tony, when he received the invoice on August 22, 2003 reflecting the $7.50 per carton price, he called Xavier Brutyn and told him that he was originally quoted $7.25 per carton. However, the only documentary evidence presented supporting the $7.25 per carton price is Tony's notation on the invoice "per quote." Although I am troubled by the fact that the invoice reflecting the $7.50 price per carton was not faxed to Gagliano until a month after the delivery of the tomatoes, I am nevertheless persuaded that the agreed price was $7.50 per carton. Thus, Brutyn is owed $772.50 on this invoice.

### 4. Invoices #2003277/2003281

#### a. Invoice #2003277

This transaction involves the sale of 444 cartons of tomatoes at a sales price of $8.50 per carton. (Ex. 37.) AGCI paid a total of $3,456.00 on this invoice. Thus, AGCI paid $8.00 per carton for 432 cartons, rather than $8.50 per carton. Brutyn agrees that only 432 cartons were delivered and, therefore, argues that it is due $216.00 on this invoice. Tony Gagliano testified that these tomatoes were sold to him by Marko Stegeman along with the lemons under invoice 2003281 on a price-after-sale basis. Tony further testified that he agreed to a price of $8.00 per carton with Marko Stegeman. However, Marko Stegeman departed Brutyn in June of 2003 and this shipment arrived at AGCI's

10

warehouse on July 29, 2003. Thus, in my opinion, Tony erred when he testified that Marko Stegeman negotiated this sale with him. Indeed, it would seem unusual, especially in the produce industry, to be negotiating the sale of goods over a month in advance of the shipping of the goods from Europe to the United States. Moreover, although Tony made numerous notations on this particular invoice when it was paid, there was no notation reflecting his understanding that the price was $8.00 per carton instead of $8.50 per carton. And, there was no documentary evidence presented indicating that the price was $8.00 per carton. In sum, I am persuaded that Brutyn is owed $216.00 on this invoice.

### b. Invoice #2003281

This transaction involves the sale of 720 cartons of various sizes of lemons for a total amount of $11,340.00. (Ex. 37-2; Ex. 55.) AGCI paid a total of $5,508.00 on this invoice. Thus, AGCI paid a price of $8.50 per carton for the 648 cartons that were actually received by AGCI. Brutyn appears to agree that only 648 cartons were delivered to AGCI (i.e., the 72 cartons of size 120 lemons indicated on the original invoice were not received by AGCI). (Pl.'s Br. at 27.) Brutyn argues that it is due $4,644.00 on this invoice.

Xavier testified that this shipment of lemons was the only shipment of lemons that was sold on a fixed price basis. (Tr. at 233.) As previously stated, it is undisputed that the other shipments of lemons were sold on an open price basis. Xavier further testified that he never agreed to modify the prices stated on invoice #2003281. (Ex. 37-2; Ex. 55.) Tony testified that these lemons were sold on a price after sale or open price basis. (Tr. at 880).

Dirk Keijer is an independent contractor who worked for the Brutyn organization performing logistics. Tony testified that, after he received an e-mail from Dirk Keijer requesting the "final

prices" for invoice #2003281, he spoke with Dirk Keijer and they agreed that $5,508.00 would be paid on this invoice. (Tr. at 886-887.) The text of the e-mail from Dirk J. Keijer to Tony Gagliano states, in pertinent part, "[p]lease can you send us the final prices for the invoice 281 and 306. Both invoices we have given you the indication prices." (Ex. 56.)

I am not persuaded that these lemons were sold on a fixed price basis. Rather, I am persuaded that these lemons were sold on a price after sale basis. Indeed, in the aforementioned e-mail, Dirk Keijer requests "final" prices for invoice 2003281. If this transaction had been on a fixed price basis, it would be absolutely unnecessary for Brutyn to request "final" prices. Nor would it make sense for Dirk Keijer to refer to the prices on the invoice as "indication" prices. Furthermore, in his e-mail Dirk Keijer requests final prices for both invoice #2003281 and invoice #2003306, and it is undisputed that invoice #2003306 was sold on a price after sale basis. In sum, Brutyn has not satisfied its burden of proving by a preponderance of the evidence that this was a fixed price sale and that it is owed $4,644.00 on this invoice.

AGCI argues that, given that there was "no agreement on the price [on this invoice]," the price is a reasonable price based on the return on the product. (Defs.'s Br. at 25.) AGCI further argues that, given its accounting on its sales of these lemons, AGCI actually overpaid Brutyn $827.56 on this invoice. This is because the accounting of AGCI's sales of these lemons shows that AGCI only received a 3.5% commission on this sale, and a normal commission for a U.S. importer is 15%. Nevertheless, I am satisfied that there was an agreement on the price of this invoice. Indeed, Tony Gagliano testified that he agreed to the price of $5,508.00 on this invoice with Dirk Keijer. Such being the case, Tony Gagliano *agreed* to take only a 3.5% commission on this invoice. Thus, I am satisfied that AGCI did not overpay Brutyn $827.56 on this invoice.

**5. Invoice #2003317**

This transaction involves the sale of 3150 cartons of cluster tomatoes at a sales price of $9.00 per carton. (Ex. 38.) AGCI paid a total of $25,200.00 on this invoice, and thus, paid $8.00 per carton, rather than $9.00 per carton. Brutyn argues that it is owed $3,150.00 on this invoice.

Xavier testified that Tony and he agreed to the price of $9.00 per carton on this invoice over the phone and that such agreement is memorialized on invoice #2003317. (Tr. at 247.) Xavier further testified that he never agreed to modify the price of $9.00 per carton. (Tr. at 248.) On August 19, 2003, when this shipment of tomatoes arrived at Brutyn's warehouse in New Jersey, Brutyn requested a USDA inspection of the shipment. (Ex. 39.) The USDA inspection revealed 0% decay on the shipment. (Ex. 39.)

Tony testified that these tomatoes were too small to sell to his supermarket customers. (Tr. at 863.) Tony further testified that because these tomatoes were too small, they had to be repacked into clamshells (4 tomatoes per clamshell) so that they could be sold to the supermarkets. (Tr. at 865.) The repacking of the tomatoes into clamshells increased Tony's labor costs associated with this shipment. (Tr. at 866-67.) Tony further testified that this was an open price sale, as were all of the sales at issue in this case, and that he paid $8 per carton because that was what "[he] could afford to pay [Brutyn, that is, given the small size of the tomatoes]." (Tr. at 868.) Thus, Tony testified that there was a "quality" problem with these tomatoes, i.e., they were "too small."

However, during his testimony regarding this transaction, Tony did not assert, nor even imply, that he contacted Brutyn promptly following the receipt of these "small" tomatoes to indicate that there was a quality problem with the shipment. Nor was there any documentary evidence presented by AGCI indicating that Brutyn was ever notified that these tomatoes were "too small" and

13

thus, there was a quality problem with this produce. AGCI argues that Brutyn should have known that these tomatoes were "too small" because they were 41-43 count, and thus, were "medium" tomatoes, not "large" tomatoes. However, even assuming that Brutyn should have known that the tomatoes were "too small," in light of the court's conclusion regarding the pricing agreement, it was AGCI's responsibility to notify Brutyn of quality problems upon receipt of the produce. Simply put, I am persuaded that Brutyn is owed $3,150.00 on this invoice.

**6. Invoice #2003318**

This transaction involves the sale of 1446 cartons of cluster tomatoes at a sales price of $9.00 per carton. (Ex. 60.) AGCI made no payment on this invoice. Tony testified that he was not made aware of this shipment until August 18th or 19th and that he advised Xavier that he did not have a truck to move these tomatoes to Milwaukee at that time. (Tr. at 893-895.) Tony further testified that Dirk Keijer called Tony and asked him to take delivery of the tomatoes. AGCI's truck picked up the tomatoes in New Jersey on Friday, August 22, 2003 and the tomatoes arrived in Milwaukee on Monday, August 25, 2003. (Ex. 60-15.)

AGCI's receiving report shows that the tomatoes were of poor quality and had decay. (Ex. 60-9.) On August 26, 2003, a USDA inspection was performed reporting an average of 50% defects on each carton of "Liberty Star" tomatoes, with a range of 27-70% decay on the Liberty Star tomatoes, and an average of 18% defects on the "Flandria" tomatoes with a range of 9-26% decay on the Flandria tomatoes. The USDA inspection found that the decay was in "early to advanced stages." (Ex. 60-4.) That same day, Tony faxed the USDA inspection to Xavier Brutyn. (Ex. 60-5.) AGCI incurred a loss of $2,247.46 on these tomatoes. (Ex. 1018.)

14

Brutyn argues that the decayed tomatoes were the result of AGCI's failure to timely pick up the produce in New Jersey on August 19, 2003 when they were ready for pickup, and thus, Brutyn is owed $13,041.00 on this invoice. Xavier testified that he never agreed to modify the price on this invoice and also never agreed to void it. (Tr. at 338-40.) Xavier testified that he called Tony numerous times regarding these tomatoes, asking that Tony send a truck to pick them up. (Tr. at 387.) Xavier testified that the normal transit time from New Jersey to Milwaukee is one or two days, not three days. (Tr. at 362.) In further support of its claim, Brutyn introduced into evidence an e-mail from Tony to Xavier Brutyn dated Thursday, August 21, 2003. (Ex. 107.) That e-mail states as follows:

> DEAREST XAVIER: SORRY FOR THE MYRIAD EFFECTS OF THE DOMINOS
> DROPPING ONE BY ONE: I AM WITH YOU 100% AND I THINK ALL WILL
> BE OK ON THIS END. I WILL HAVE A FULL TRUCK FOR YOU
> TOMORROW. SORRY FOR THE TROUBLE. PLEASE BEAR WITH ME,
> MOST SINCERELY AND RESPECTFULLY,
> TONY

(Ex. 107.)

Simply put, Tony's e-mail to Xavier dated August 21, 2003 corroborates Xavier's testimony that he called Tony repeatedly asking for him to send a truck to pick up the tomatoes and that Tony failed to send a truck until Friday, August 22, 2003. Furthermore, in light of the testimony and documentary evidence submitted on the other transactions, I am satisfied that the transit time of three (3) days from New Jersey to Milwaukee was abnormal. In sum, I am persuaded that the decayed tomatoes were a result of AGCI's failure to send a truck to New Jersey in a timely fashion to pick up the load, and a result of the abnormal transit time from New Jersey to Milwaukee. Given that this

15

was an f.o.b. sale, if damage occurred during transit, it was AGCI's responsibility to seek to recover from the trucking company. Thus, I am satisfied that Brutyn is owed $13,041.00 on this invoice.

### 7. Invoice #2003327

This transaction involves the sale of 3150 cartons of cluster tomatoes at a sales price of $9.50 per carton. (Ex. 40.) AGCI paid a total of $25,200.00 on this invoice, and thus, paid $8.00 per carton, rather than $9.50 per carton. Brutyn argues that it is owed $4,725.00 on this invoice.

This shipment of tomatoes was inspected by the USDA when it arrived at Brutyn's warehouse in New Jersey. The USDA inspection certificate shows that the tomatoes had < .5% decay. (Ex. 42.) Xavier testified that AGCI did not report any problems with this shipment. (Tr. at 276.) Nor did Xavier ever agree to modify the price reflected on the invoice. (Tr. at 271.) On August 26, 2003, Xavier sent Tony an e-mail stating that this shipment of tomatoes was ready for pick up. (Ex. 41.) The text of the e-mail states, in pertinent part, as follows:

Manifest:     3150 tomatoes on the vine     label: Nature's choice

Price: $9.50 Fob Export Transport (as communicated last week)

(Ex. 41.) AGCI argues that this shipment was sold on an open price basis because Xavier "admitted he was 'quoting' a price to Tony Gagliano of $9.50/carton" in the e-mail. (Defs.' Br. at 35.) I disagree.

With respect to the e-mail, Xavier testified as follows: "What I think, and I'm not sure, but my opinion, is that I quoted Tony over the phone like I always did [and then set forth the price in the e-mail]. . . ." (Tr. at 284.) Xavier then testified, in response to his counsel's question, that when he spoke to Tony over the phone he was "giving [Tony] price quotes." (Tr. at 284.)

Simply put, I am persuaded that this was a fixed price sale and that the e-mail clearly sets forth the terms of the sale. Nowhere in the actual e-mail does Xavier use the term "quoted" price or "indicated" price. Nor was there any documentary evidence, such as a return e-mail from Tony to Xavier, stating that, although the e-mail set forth a price of $9.50/carton, Tony believed that to be an "open" or "indicated" price.

Tony testified that these tomatoes were "too small" to sell outright to his supermarket customers and therefore AGCI had to repack many of the tomatoes into clamshells or put them into net bags to be sold to his supermarket customers. (Tr. at 869-70.) However, during his testimony regarding this transaction, Tony did not assert, nor even imply, that he contacted Brutyn promptly following the receipt of these "small" tomatoes to indicate that there was a quality problem with the shipment. Nor was there any documentary evidence presented by AGCI indicating that Brutyn was ever notified that these tomatoes were "too small," and thus, there was a quality problem with this produce. Such being the case, I am persuaded that Brutyn is owed $4,725.00 on this invoice.

## 8. Invoice #2003339

This transaction involves the sale of 3150 cartons of cluster tomatoes at a sales price of $9.50 per carton. (Ex. 40.) AGCI paid a total of $23,617.50 on this invoice, and thus, paid $7.50 per carton, rather than $9.50 per carton. Brutyn argues that it is owed $6,307.50 on this invoice.

The AGCI receiving report indicates that upon receipt of this shipment, AGCI was short one carton, i.e., AGCI received 3149 cartons instead of 3150. (Ex. 43-6.) There was no damage reported by AGCI upon receipt of the product as reflected on its receiving report. (Ex. 43-6.) Tony testified that the tomatoes in this shipment were "small" tomatoes because there were 39 to 41 tomatoes per vine. (Tr. at 873.) Tony further testified that he did not agree to the price of $29,925.00, i.e., the

17

price indicated on the invoice, and that Xavier did not agree to the price of $23,617.50, i.e., the price that AGCI paid on the invoice. On other transactions involving the "small" tomatoes, Tony testified that he had increased labor costs given that he had to repack the tomatoes into clamshells. Yet, with respect to this transaction, Tony did not testify that he had to do any repacking. Nevertheless, AGCI argues that, due to the small size, AGCI had to resort and repack many of the cartons to resell them to AGCI's customers in Milwaukee. (Defs.' Br. at 36.)

During his testimony regarding this transaction, Tony did not assert, nor even imply, that he contacted Brutyn promptly following the receipt of these "small" tomatoes to indicate that there was a quality problem with the shipment. Nor was there any documentary evidence presented by AGCI indicating that Brutyn was ever notified that these tomatoes were "too small" and, thus, there was a quality problem with this produce. Such being the case, I am persuaded that Brutyn is owed $6,298.00 on this invoice (3149 cartons at $9.50/carton).

**9. Invoice #2003348**

This transaction involves the sale of 3150 cartons of cluster tomatoes at a sales price of $9.50 per carton, for a total invoice price of $29,925.00. (Ex. 45.) AGCI paid a total of $18,900.00 on this invoice. Brutyn argues that it is owed $11,025.00 on this invoice.

The AGCI receiving report indicates that upon receipt of this shipment on September 15, 2003, 137 cases were damaged and 6 pallets needed to be restacked. (Ex. 45-3.) A number of pictures were taken of the pallets when they arrived at AGCI's facility in Milwaukee. (Ex. 47-2 to 47-12.) On September 19, 2003, Tony sent an e-mail to Xavier advising him that the pictures were being faxed and explaining that the damage was caused by Export Transport failing to lower the pallets to 120 boxes/pallet rather than 150 boxes/pallet. (Ex. 50.)

18

Xavier testified that he did not agree to a modification of the price as reflected on invoice #2003348. (Tr. at 299-300.) Xavier testified that, based upon the damage reported on AGCI's receiving reports, Xavier would have owed AGCI a credit of $1,301.50 on this invoice. (Tr. at 304.) Xavier further testified that, notwithstanding the transportation damage, he never received any complaints from AGCI regarding the quality of the tomatoes. (Tr. at 327.)

Tony testified that these tomatoes were "medium-small"and that he therefore had to restack and repack the tomatoes into clamshells. (Tr. at 875.) Tony further testified that "there was a little damage" on this shipment. (Tr. at 875.) However, during his testimony regarding this transaction, Tony did not assert, nor even imply, that he contacted Brutyn promptly following the receipt of these "small-medium" tomatoes to indicate that there was a quality problem with the shipment. Nor was there any documentary evidence presented by AGCI indicating that Brutyn was ever notified that these tomatoes were "too small" and, thus, there was a quality problem with this produce. In light of the court's aforementioned conclusion regarding the pricing agreement between the parties, it was AGCI's responsibility to notify Brutyn of the quality problems upon receipt of the produce. Such being the case, I am persuaded that Brutyn is owed $9,723.50 ($11,025.00 minus a credit of $1,301.50) on this invoice.

## 10. Invoice #2003355

This transaction involves a mixed load of tomatoes and peppers, i.e., 450 cartons of yellow peppers at a sales price of $14.25/carton, 375 cartons of beef tomatoes at $15.75/carton, and 300 cartons of cluster tomatoes at $13.00/carton. (Ex. 53.) The total amount due as reflected on the face of the invoice is $16,218.75. AGCI paid $14,362.50 on this invoice and, thus, Brutyn argues that it is owed $1,856.25 on this invoice.

19

Xavier testified that he never received any claims from AGCI regarding damage on this load. (Tr. at 330-31.) Xavier further testified that he never agreed to the amount of $14,362.50 that AGCI paid on this invoice. (Tr. at 331.) There was no damage reported by AGCI upon receipt of the product as reflected on its receiving report and the quality of both the peppers and tomatoes was reported on AGCI's receiving report as being "good." (Ex. 53-7.)

Tony testified that he paid $14,362.50 on this invoice because "we wanted to make a reasonable profit." (Tr. at 878.) Tony further testified that he and Xavier never agreed to a price on this transaction. (Tr. at 878.) Tony did not testify regarding any quality problems with the produce in this shipment. Nor was there any documentary evidence presented by AGCI indicating that Brutyn was ever notified that there were any problems with this shipment. In light of the court's aforementioned conclusion regarding the pricing agreement between the parties, it was AGCI's responsibility to notify Brutyn of any problems upon receipt of the produce. Such being the case, I am persuaded that Brutyn is owed $1,856.25 on this invoice.

**11. Invoice #2003384**

This was the last transaction conducted between the parties. This transaction involves the sale of 600 cartons of cluster tomatoes at a sales price of $15.50 per carton, for a total invoice price of $9,300.00. (Ex. 63-1.) This shipment arrived at AGCI's facility on October 24, 2003. (Ex. 63-5.) There was no damage reported by AGCI upon receipt of the product. (Ex. 63-5.) AGCI's receiving report indicates that the quality of the tomatoes was "good," however, the tomatoes were "small." (Ex. 63-7.)

According to AGCI, it did not make any payment on "this transaction because this was the last transaction between the parties and it was not billed by Brutyn until over a month after delivery

by which time the parties were in a dispute over what was owed on many transactions." (Defs.' Br. at 41.)

Xavier testified that he sold to AGCI 600 cluster tomatoes at a price of $15.50 [per carton]. (Tr. at 394.) Xavier further testified that AGCI never reported any problems with this produce. (Tr. at 397.) Tony testified that he withheld payment on this invoice because he believed that losses he incurred on other files offset any money due on this invoice. (Tr. at 900.) Tony did not testify regarding any quality problems with the produce in this shipment. Nor was there any documentary evidence presented by AGCI indicating that Brutyn was ever notified that there were any problems with this shipment.

In light of the court's aforementioned conclusion regarding the pricing agreement between the parties, it was AGCI's responsibility to notify Brutyn of any problems upon receipt of the produce. Thus, I am satisfied that Brutyn is owed $9,300.00 on this invoice.

**The Lemons Transactions**

**12. Invoices 2003213, 2003234, 2003235**

These transactions all involve the sale of Spanish lemons. It is undisputed that all of the lemons transactions were conducted on an "open" price or "price after sale" basis. The lemons sold on invoices 2003213, 2003234 (Ex. 58-8.), and 2003235 (Ex. 58-9.) all arrived at AGCI's facility on the same truck on July 1, 2003. The indicated price reflected on invoice #2003213 is $5,752.00. It is undisputed that AGCI paid invoice #2003213 in full. According to AGCI, after paying invoice #2003213 in full, AGCI still sustained a loss of $2,989.89 on these three invoices. (Defs.' Br. at 43.) AGCI argues that its payment of $5,752.00 on invoice #2003213 settled the price for all of these

21

lemons. (Defs.' Br. at 44.) AGCI's receiving report indicates that all of the lemons sold on these three invoices showed 11-13% decay, were of "fair quality" with "scars and marks." (Ex. 58-7.)

Xavier testified that he never received an account of sale with respect to these lemons. However, given that this was a price after sale transaction, AGCI was not obligated to provide Bruytn an accounting of its sales on these invoices. Indeed, in *Sucasa Produce v. A.P.S. Marketing, Inc.*, the USDA hearing officer stated that a "price after sale" contract "assumes that the parties will negotiate a price after the goods are sold. If they do not, the reasonable value of the goods should be imputed. [The USDA has] stated that although the Regulations do not place a duty to account upon a buyer who purchases on an open basis, should the parties fail to reach an agreement as to price the receiver fails to account accurately and in detail at its own risk." 59 Agric. Dec. at 424.

AGCI argues that its full payment of invoice #2003213 settled all three invoices and therefore, AGCI should not have to pay anything to Brutyn for the lemons received on invoices #2003234 and #2003235. I am not so persuaded. This is because it is undisputed that AGCI accepted these shipments of lemons, and despite the fact that they incurred a loss on both of these invoices, I am not persuaded that AGCI should not pay *anything* to Brutyn for these lemons. Indeed, on invoice #2003234, AGCI received 144 cartons of 100 count lemons. Brutyn has submitted the market news service reports for 100 count lemons for July 1, 2003, which show a price of $16-18 for 100 count lemons. AGCI argues that the court should not rely upon the market news reports reflecting the prices in New York City because New York City is not "at or near" the place of acceptance, Milwaukee. *See Supreme Berries, Inc. v. R. C. McEntire, Jr.*, 49 Agric. Dec. 1208, 1215, 1990 USDA LEXIS 137 (1990). However, given that there have been no other market news reports entered into evidence reflecting the prices of lemons in cities closer to Milwaukee, the court will rely

22

upon the prices of 100 count lemons in New York City. Yet, because the court recognizes that the New York City market is decidedly different from the Milwaukee market, the court will only rely upon the lowest price listed in the New York market to determine a reasonable price for the 100 count lemons in Milwaukee, i.e., $16 per carton. (Pl.'s Br. at 53.) The court will also modify the price of $16 per carton to reflect the percentage of defects noted on AGCI's receiving report. *See C.H. Robinson Co. v. Kay Gee Produce Co.*, 60 Agric. Dec. 314, 2001 WL 1891235, *3 (2001) (applying the percentage of defects to the value of the produce if it had been as warranted to determine the amount of damages incurred upon receiving produce with quality defects). This is because, although Brutyn argues that these lemons were of "good quality," the only documentary evidence submitted in this case regarding the quality of these lemons reveals that these lemons had 11-13% decay upon arrival. Such being the case, I am satisfied that AGCI is entitled to a deduction of $2.08 per carton on this load to reflect the percentage of decay, and therefore, the total amount due to Brutyn on this invoice is $2,004.48. (144 cartons x $13.92/carton).

On invoice #2003235, AGCI received 72 cartons of 120 count lemons. The New York City prices of 120 count lemons on July 1, 2003 was $17 per carton. The court will also modify the price of $17 per carton to reflect the percentage of defects noted on AGCI's receiving report. This is because, although Brutyn argues that these lemons were of "good quality," the only documentary evidence submitted in this case regarding the quality of these lemons reveals that these lemons had 11-13% decay upon arrival. Such being the case, I am satisfied that AGCI is entitled to a deduction of $2.21 per carton on this load to reflect the percentage of decay, and therefore, the total amount due to Brutyn on this invoice is $1,064.88 (72 cartons x $14.79/carton).

23

**13. Invoice #2003254**

This transaction involves the sale of 301 cartons of Spanish lemons on a "price after sale" basis. (Ex. 59.) Specifically, this transaction involves 261 cartons of 60 count lemons and 40 cartons of 70 count lemons. (Ex. 59.) The indicated price reflected on invoice #2003254 is $11.50 per carton for a total invoice price of $3,461.50. (Ex. 59.) These lemons arrived at AGCI's warehouse in Milwaukee on July 9, 2003. AGCI's receiving report indicates that the condition of the lemons upon arrival in Milwaukee was: "2-3 [%] decay per case, thick skin, scar and marks, some blemish, fair quality on both sizes." (Ex. 58-9.) Tony testified that, due to the condition problems and the large size of the lemons ("as big as baseballs"), he was unable to sell any of these lemons. (Tr. at 890.) On October 6, 2003, AGCI obtained a dump inspection that showed that these lemons had severe decay. (Ex. 59-4.) Xavier testified that Brutyn never received any sales information regarding these lemons and he did not know that these lemons were going to be inspected by the USDA on October 6, 2003. (Tr. at 416.) AGCI sustained a loss on this transaction in the amount of $1,120.56. (Tr. at 891; Ex. 1017.)

Here, again, AGCI argues that given the "poor" quality of these lemons, and the fact that AGCI incurred a loss of $1,120.56 on this invoice, AGCI should not have to pay Brutyn *anything* for these lemons. Again, I am not so persuaded. While I agree that it is nonsensical that AGCI would purposefully refuse to sell these lemons, such that it would incur a loss of $1,120.56, I am also satisfied that AGCI should have to pay Brutyn something for the lemons received on invoice #2003254. Indeed, AGCI received 261 cartons of 60 count lemons and 40 cartons of 70 count lemons on this invoice. The only pricing information Brutyn entered into evidence regarding this invoice is the New York City prices of 100 count lemons. Simply put, I do not think it would be fair

24

to AGCI to rely upon the price of 100 count lemons in New York City to determine the price of 60/70 count lemons in Milwaukee. Such being the case, I will rely upon the indicated prices Brutyn submitted for this invoice, i.e. $11.50 per carton. The court will also modify the price of $11.50 per carton to reflect the percentage of defects noted on AGCI's receiving report. This is because, although Brutyn argues that these lemons were of "good quality," the only documentary evidence submitted in this case regarding the quality of these lemons reveals that these lemons had 2-3% decay upon arrival.[2] Such being the case, I am satisfied that AGCI is entitled to a deduction of 35 cents ($11.50 x 3% decay) per carton on this load to reflect the percentage of decay, and therefore, the total amount due to Brutyn on this invoice is $1,064.88 (301 cartons x $11.15/carton).

**14. Invoice #2003306**

This transaction involves the sale of 360 cartons of Spanish lemons on a "price after sale" basis. (Ex. 60-3.) Specifically, this transaction involves the sale of 144 cartons of 60 count lemons, 144 cartons of 70 count lemons, and 72 cartons of 80 count lemons. (Ex. 60-3.) The indicated prices reflected on invoice #2003254 are $9.00/carton for the 60 count and 70 count lemons and $11.00/carton for the 80 count lemons, for a total invoice price of $3,384.00. (Ex. 60-3.)

These lemons arrived at AGCI's warehouse in Milwaukee on August 25, 2003. AGCI's receiving report indicates that the condition of the lemons upon arrival in Milwaukee was: "product show [sic] decay and skin breakdown." (Ex. 60-8.) On August 26, 2003, these lemons were inspected by the USDA. (Ex. 60-4.) The USDA inspector stated that the lemons had an average of

---

[2] The court notes that on October 6, 2003, AGCI obtained a dump inspection that showed that these lemons had severe decay. (Ex. 59-4.) However, this inspection was not performed until three (3) months after these lemons arrived and, such being the case, the court will not rely upon that inspection, but rather will rely upon AGCI's receiving report to determine the amount to discount for the quality of the lemons.

Case 2:04-cv-00527-WEC   Filed 07/02/07   Page 25 of 40   Document 119

4% contact spots, 9% decay on the 60 and 70 count lemons and 3% decay on the 80 count lemons. (Ex. 60-4.) The inspector also noted that the decay was in the early to advanced stages. (Ex. 60-4.) According to AGCI, there were few buyers for these lemons, and AGCI incurred a loss of $264.00. (Ex. 1018.)

Brutyn argues that AGCI should pay the indicated price of $3,384.00. Xavier testified that he was never notified that there were any problems with these lemons and he never received a sales accounting of these lemons. (Tr. at 402, 404.) However, given that this was a price after sale transaction, AGCI was not obligated to provide Bruytn with an accounting of its sales on these invoices. *Sucasa Produce*, 59 Agric. Dec. at 424. And, to reiterate, these lemons were sold on a price after sale basis.

Here, again, AGCI argues that because it incurred a loss of $264.00 on this invoice it should not have to pay Brutyn *anything* for these lemons. Again, I am not so persuaded. Indeed, it is undisputed that on August 25, 2003, AGCI accepted the 144 cartons of 60 count lemons, 144 cartons of 70 count lemons, and 72 cartons of 80 count lemons shipped on this invoice. (Ex. 60-3.) Brutyn did not enter into evidence any market news reports reflecting the prices of 60, 70, or 80 count lemons on this date. Such being the case, I will rely upon the indicated prices Brutyn submitted for this invoice, $9.00/carton for the 60/70 count lemons and $11.00/carton for the 80 count lemons (Ex. 60-3.). The court will also modify the price per carton to reflect the percentage of defects noted on the USDA report. The USDA inspector stated that the lemons had an average of 4% contact spots, 9% decay on the 60 and 70 count lemons and 3% decay on the 80 count lemons. (Ex. 60-4.) Such being the case, I am satisfied that AGCI is entitled to a deduction of 81 cents ($9.00 x 9% decay) per carton on the 60/70 count lemons, and a deduction of 33 cents per carton on the 80 count lemons

26

($11.00 x 3%).  Therefore, the total amount due to Brutyn on this invoice is $3,092.40 (288 cartons

x $8.19/carton + 72 cartons x $10.19/carton).

**Marko Stegeman's Transactions**

**15. Invoice #2003174**

This transaction involves a mixed load of tomatoes and peppers: specifically, 480 cartons of

beef tomatoes at $15.00/carton; 360 cartons of red peppers at $15.50/carton; 240 cartons of yellow

peppers at $15.50/carton; 100 cartons of orange peppers at $15.50/carton; and 1050 cartons of cluster

tomatoes at $8.00/carton, for a total invoice price of $26,450.00.  (Ex. 4-8.)  AGCI paid $23,293.00

on this invoice, and thus, Brutyn argues that it is owed $3,157.00 on this invoice.

Marko Stegeman testified that he and Tony agreed to these prices over the phone prior to the

containers being loaded in Europe.  (Tr. at 563-64.)  Stegeman further testified that Exhibit 4-8 is the

original invoice that he created.  (Tr. at 576.)  Stegeman also testified that he never agreed to reduce

the prices to those prices handwritten on Exhibit 4.  (Tr. at 578-79.)  Nor did he agree to a reduction

in the amount of $3,157.00 on this invoice.  (Tr. at 579.)  Stegeman testified that he never received

any complaints about the quality of this produce from Tony, and that if Tony had a problem with

produce Stegeman would receive a telephone call from Tony about such a problem.  (Tr. at 583.)

Tony testified that he wrote the price that he and Stegeman agreed to on Exhibit 4, which

Tony argues is an invoice (showing 0.00 as the price for each commodity), and which Stegeman

refers to as a "passing," i.e., a document to be used during the transport of the produce from Europe

to the United States without revealing the prices at which the goods were sold.  (Tr. at 569, 817.)

Tony testified that he did not agree to the prices as reflected on Exhibit 4-8.  (Tr. at 816-17.)

Simply put, in light of the court's aforementioned conclusion regarding the pricing agreement between the parties, it was AGCI's responsibility to notify Brutyn of any problems upon receipt of the produce. Such being the case, I am persuaded that Brutyn is owed $3,157.00 on this invoice.

**16. Invoice #2003189**

This transaction involves the sale of 1500 cartons of cluster tomatoes at a sales price of $9.00 per carton, for a total invoice price of $13,500. (Ex. 6-2.) Stegeman testified that at some point in time he agreed to change the price from $9.00/carton to $7.50/carton, for a total invoice price of $11,250.00. (Ex. 6-1; see also Ex. 6-2 (noting "$7.50 per Marko") (Tr. at 597.)) AGCI paid $10,5000.00 on this invoice, that is, $7.00 per carton, rather than $7.50 per carton. (Ex. 6.) Thus, Brutyn argues that it is owed $750.00 on this invoice. Stegeman testified that he never agreed to a price of $7.00 per carton on this invoice. (Tr. at 601.) Tony testified that Stegeman agreed to a price of $7.00 per carton so that AGCI could make some money on this invoice. (Tr. at 820-21.)

I find the testimony of Marko Stegeman more credible than the testimony of Tony on this issue. Thus, in light of the court's aforementioned conclusion regarding the pricing agreement between the parties, I am persuaded that Brutyn is owed $750.00 on this invoice.

**17. Invoices #2003216 and #2003219 "The Pepper Deal"**

These two (2) transactions have come to be known as the infamous "pepper deal." These transactions involve two shipments of bell peppers. Stegeman testified that he and Tony discussed the fact that Brutyn would sell to AGCI peppers at around $14.00 or $14.50/carton. (Tr. at 620.) Stegeman testified that he and Tony never came to a firm agreement on the prices for the peppers. (Tr. at 620.) Stegeman testified that he and Tony agreed that Brutyn would ship "air" peppers at market prices and that Tony agreed to buy the peppers at market prices with the reservation that they

28

would work out a common solution as to how they would deal with any losses that would occur. (Tr. at 624-25.) However, Stegeman and Tony did not arrive at an agreement as to how they would "work out the losses" prior to Stegeman's departure from Brutyn. (Tr. at 625-26.) Stegeman further testified that he only entered the "firm market price[s]" into the computer system. (Tr. at 626.) And, Stegeman testified that, prior to his leaving Brutyn, he did not agree to any deductions from the market prices on these invoices. (Tr. at 631, 635.)

In my opinion, Brutyn has not satisfied its burden of proving that the prices reflected on invoice #2003216 and invoice #2003219 of $21.00 and $21.50/carton respectively, were "firm" prices. Indeed, Stegeman testified that while Tony agreed to pay market prices, he did so *with the reservation that he and Stegeman would work out a common solution based upon the losses*, thus implying that a price modification would be made based upon AGCI's return on the produce. (Tr. at 624-25.) Such being the case, because there was no agreement as to price, the appropriate price is a reasonable price based on the return on the product. I am persuaded that the price of $14.00 per carton was a reasonable price and thus, nothing further is owed to Brutyn on this invoice. Indeed, it appears as though Brutyn agreed to honor Marko Stegeman's "infamous" pepper deal as set forth in an e-mail from Dirk Keijer, on behalf of Brutyn, to Tony Gagliano. (Ex. 103) (stating, in pertinent part, that "[a]s agreed by Willy Brutyn, Marko Stegeman's infamous pepper deal was honored at a considerable loss to our organization and therefore our invoices 2003016 and 2003019 are no longer shown on [AGCI's] account").

Yet, AGCI argues that it should receive a credit on these invoices because it only received a 9.5% commission on its sales of this produce and a typical commission for a U.S. importer is 15%

29

commission. Simply put, AGCI agreed to receive a 9.5% commission, and I am satisfied that AGCI should not receive a credit on this invoice.

**18. Invoice #2003030 "the frozen tomatoes"**

This transaction involves the sale of 720 cartons of beefsteak tomatoes at $19.00 per carton for a total invoice price of $13,680.00. (Ex. 13.) There is no dispute that the parties originally agreed to this price. (Defs.' Br. at 53.) The tomatoes were shipped by air, and after the tomatoes arrived at AGCI's facility and after they were sent out to AGCI's customers, problems with the tomatoes arose. (Ex. 15-3.) AGCI requested a USDA inspection on January 21, 2003 (January 20, 2003 was a federal holiday). (Ex. 15-3.) Marko Stegeman also ordered his own surveyor to inspect the tomatoes at AGCI's facility. (Tr. at 647.)

Stegeman testified that AGCI's customers who had received these tomatoes were returning them. (Tr. at 655-56.) Brutyn's independent surveyor found that the tomatoes had been exposed to below freezing temperatures for at least 47 minutes while in the custody of American Airlines. (Ex. 13-11, 13-12.) On January 23, 2003, Marko Stegeman notified American Airlines' claim representative that Brutyn would be filing a claim against the airline for the damage to the tomatoes. (Ex. 13-9.) On February 4, 2003, Stegeman settled the file with AGCI by authorizing a credit and reducing the invoice price to $10.00 per carton, which AGCI paid in full. (Ex. 13-13.) Stegeman testified that Tony agreed that, if the airline denied the claim, AGCI would be held responsible for the remaining amount of $6,480.00 on the invoice. (Tr. at 657.) This is so because it was a difficult claim to make against the airline, due to the fact that AGCI's driver signed for receipt of the goods without making any remarks as to any freezing damage. Stegeman testified that his understanding

30

was that he had an agreement with Tony regarding the payment of $6,480.00, if the airline denied the claim.  (Tr. at 659.)

Brutyn argues that the credit which Marko Stegeman gave to AGCI on this transaction was contingent on the airline paying the transportation claim.  In support of this argument, Brutyn relies upon an e-mail that Marko Stegeman sent to various people at the Brutyn organization stating that Marko Stegeman would hold AGCI responsible if the airline denied the claim.  (Ex. 13-8.)

I am persuaded that both parties should bear half of the loss sustained on the "frozen tomatoes."  This is because although the freezing damage occurred while the tomatoes were in the possession of the airline, that is, at a time when Brutyn was liable for any damage that may have occurred, AGCI's driver did sign for good delivery when picking up the "frozen tomatoes" from the airport.  Furthermore, no evidence has been presented indicating that AGCI's driver inspected the tomatoes or took a pulp temperature of the tomatoes at the airport, prior to signing for delivery.  If AGCI's driver would have done so, presumably, AGCI would have detected the fact that the tomatoes had in fact been "frozen" and would not have signed for good delivery.  In light of all of the foregoing, I am persuaded that the "loss" should be split 50/50 such that AGCI owes Brutyn $3,240 on this invoice.  It appears as though this 50/50 split of the "loss" was also contemplated by the parties.  (Ex. 103) (stating that "American Airline refused to honor our attempt to file a claim. It is our understanding that the product was frozen but that it was agreed that if the airline denied our claim the loss would be split 50/50").

31

**19. Airline Claims: Invoices 2002220, 2002252, 2002255, 2002282**

**a. Invoice #2002220**

This transaction involves a mixed load of red and yellow peppers and cluster tomatoes, for a total invoice price of $9,885.00. (Ex. 24-13.) This was an air shipment, and the airline carrier documented damage to the load: "skids broken and fresh veg[etables] crushed down onto skids . . . 12 boxes damaged." (Ex. 24-4.) Based upon the damage to the load, Marko Stegeman agreed to reduce the price to $8,853.00, and issued a new invoice, which AGCI paid in full. (Ex. 24-11.) Brutyn also filed a claim against the airline for the damage. (Ex. 24-3.)

As best as this court can discern, Brutyn's argument is that AGCI at some point made a false statement regarding the damage reported by the airline. According to Brutyn, this is because AGCI's quality control report does not specifically state that 12 cases were damaged. (Pl.'s 77.) However, AGCI's receiving report does indicate that 12 cases of tomatoes were damaged. (Ex. 24-6.)

Regardless, simply because AGCI's receiving report states that the produce was of "good quality" it does not necessarily follow that AGCI made a false statement. Clearly, there was damage to this load of produce, or the airline would not have documented such damage. (Ex. 24-4.) In sum, I am not persuaded that there were any false statements or misrepresentations made with respect to this load, and even assuming there were, Brutyn has not proven how it was damaged by such statements. Thus, Brutyn is not owed anything further on this invoice.

**b. Invoice # 2002252**

This transaction involves the sale of 600 cartons of tomatoes at 13.00 per carton, for a total invoice price of $7,800.00. (Ex. 25-10.) This was also an air shipment, and airline damage was noted by Brutyn's customs broker, T.H. Weiss. (Ex. 25-18.) T.H. Weiss made a claim against the

32

airline on Brutyn's behalf. (Ex. 25-12.) Stegeman and Tony agreed to a modified price on this invoice based upon the airline damage, and such modified invoice was paid in full. (Ex. 25-5.)

Again, as best as this court can discern, Brutyn's argument is that AGCI at some point made a false statement regarding the damage reported by T.H. Weiss. This is because, according to Brutyn, there was no airline damage reported on AGCI's quality control report.

Nevertheless, given that Brutyn's own customs broker noted the damage, I am not persuaded that there were any false statements or misrepresentations made with respect to this load. And, even assuming there were, Brutyn has not proven how it was damaged by such statements. Thus, Brutyn is not owed anything further on this invoice.

### c. Invoice #2002255

This transaction involves the sale of 600 cartons of tomatoes at $13.85 per carton. This was also an air shipment, and the airline acknowledged damage to the load. (Ex. 26-13.) (stating that "41 boxes of veggies [were] damaged"). Brutyn's customs broker filed a claim on behalf of Brutyn against the airline for such damage. (Ex. 26-8.) Stegeman and Tony agreed to a modified price on this invoice based upon the airline damage, and such modified invoice was paid in full. (Ex. 26-5.)

Once again, as best as this court can discern, Brutyn's argument is that AGCI at some point made a false statement regarding the damage reported by T.H. Weiss. This is because, according to Brutyn, there was no airline damage reported on AGCI's quality control report.

However, AGCI's receiving report did note that 39 cases were caved in, though the product was not damaged. (Ex. 26-11.) Moreover, simply because no product was damaged it does not follow that AGCI would not incur additional costs based upon the damage to the boxes caused by the airline, i.e. repacking of the produce due to the airline damage. (Tr. at 670-71.)

33

Such being the case, I am not persuaded that there were any false statements or misrepresentations made with respect to this load. And, even assuming there were, Brutyn has not proven how it was damaged by such statements. Thus, Brutyn is not owed anything further on this invoice.

**d. Invoice #2002282**

This transaction involves the sale of 720 cartons of beefsteak tomatoes at $17.00 per carton. This was also an air shipment, and the airline acknowledged damage to the load. (Ex. 27-9.) (stating that "ten skids shipped were shifted during travel . . . boxes crush [sic] on ten different skids . . . can not give accurate account of all that was damage[d]"). Brutyn's customs broker filed a claim on behalf of Brutyn against the airline for the damage. (Ex. 27-7.) Stegeman and Tony agreed to a modified price on this invoice based upon the airline damage, and such modified invoice was paid in full. (Ex. 27-13.)

Again, as best as this court can discern, Brutyn's argument is that AGCI at some point made a false statement regarding the damage reported by the airline. According to Brutyn, this is because AGCI's receiving report notes that only 25 cases were damaged. (Ex. 27-6[B]). Stegeman testified that, if he had had that receiving report before him when he agreed to the modification of the invoice price, he may have asked some more specific questions regarding the damage. Nevertheless, in the end, I am not persuaded that there were any false statements or misrepresentations made with respect to this load. And, even assuming there were, Brutyn has not proven how it was damaged by such statements. Thus, Brutyn is not owed anything further on this invoice.

34

*B. Punitive Damages*

Brutyn argues that because the defendants' acts were "repeated, willful, and egregious," their acts "warrant the imposition of punitive damages in an amount that will hopefully deter future willful and egregious violations of the PACA." (Pl.'s Reply Br. at 7.)  To be sure, pursuant to 7 U.S.C. § 499h(a), if a buyer has "violated any of the provisions of section 499b] . . . the Secretary may publish the facts and circumstances of such violation and/or, by order, suspend the license of such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke, the license of the offender." 7 U.S.C. § 499h(a).  However, the plaintiff has not directed this court to a case, nor has this court been able to find one, in which a district court imposed punitive damages upon a PACA licensee for violation of the "full and prompt payment" provision of PACA.  Accordingly, I am not persuaded that it would be appropriate for the court to impose punitive damages.

*C. Attorney's Fees*

Brutyn argues that it is entitled to attorney's fees and interest in this action based on the following language that appears on each of invoices at issue in this case:

> The purchase price for the goods sold on this invoice shall be increased to include interest at the rate of 1.5% per month from the due date until full payment is received and to include all attorney fees and costs incurred in collecting the amount due. No modification of this invoice is permitted without the prior written consent of BRUTYN NV. Notice of any claim shall be in writing sent to the office of BRUTYN NV at the above fax number or by e-mail to the above email address not later than 24 hours after delivery in accordance with the delivery terms stated above. All currency on this invoice is in US Dollars.

(Pl.'s Reply Br. at 29; Ex. 18.)  AGCI argues that Brutyn is not entitled to attorney's fees because attorney's fees are not awarded when there is a "good faith dispute" as to whether the account is

35

owed at all. *See Lionheart Group, Inc. v. Sy Katz Produce, Inc.*, 59 Agric. Dec. 449, 460, 2000 USDA LEXIS 73 (2000).

I am satisfied that reasonable attorney's fees and interest should be awarded to Brutyn. This is because the attorney's fees language appeared on each and every invoice that Brutyn sent to AGCI for each and every transaction, and at no point during the time in which the parties were doing business did AGCI object to such term. Based upon AGCI's failure to object to the inclusion of the term, AGCI accepted such term. *See Top Banana, LLC et al. v. Dom's Wholesale & Retail Center, Inc.*, 2005 WL 1529736, at *5 (S.D.N.Y. 2005) (holding that because the defendants did not object to the term allowing for recovery of attorney's fees and interest in the event of non-payment, as set forth on the invoices, those terms became part of the parties' contract pursuant to N.Y. U.C.C. § 2-201(2)); see also Wis. Stat. § 402.201(2) (stating that "if within a reasonable time a writing in confirmation of the contract . . . is received and the party receiving it has reason to know its contents, it satisfies the requirements of sub. (1) against such party unless written notice of objection to its contents is given within 10 days after it is received"). By failing to object to the inclusion of the attorney's fees term on the invoice and thus, accepting such term, AGCI accepted the risk that if there was a dispute concerning the amount owed to Brutyn on a particular invoice, and AGCI was ultimately found liable for a particular amount, AGCI would also incur the reasonable attorney's fees expended in collecting such amount from AGCI. Indeed, PACA allows for the recovery of attorney's fees and interest where the parties have bargained for such terms. As the court stated in *Country Best v. Christopher Ranch, LLC*, 361 F.3d 629 (11th Cir. 2004),

> [h]ad Congress intended to limit PACA claims solely to the price of the commodities, it could have inserted language reflecting that limitation in 7 U.S.C. § 499e(c)(2). Instead, it chose to allow "full payment of the sums owing in connection

36

with [commodities] transactions." This unambiguously encompasses not only the price of commodities but also additional related expenses. Such related expenses include attorney fees and interest that buyers and sellers have bargained for in their contracts."

*Id.* at 632. In sum, I am satisfied that, based upon the language contained on its invoices, Brutyn is entitled to reasonable attorney's fees and interest with respect to those invoices where the court has found amounts owing to Brutyn from AGCI.

*D. PACA Trust Claim*

Under the PACA statutory trust provision, a buyer's produce, products derived from that produce, and the proceeds gained therefrom are held in a non-segregated, floating trust for the benefit of unpaid suppliers, sellers, and agents who meet the applicable statutory requirements to be granted the status of PACA trust fund beneficiaries. *See* 7 U.S.C. § 499e(c); 7 C.F.R. §§ 46.46(b), (c). Thus, the PACA statutory trust grants certain unpaid suppliers and sellers of produce and their agents an interest in the PACA trust assets superior to that of a buyer's perfected, secured creditor. *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 199 (3d Cir. 1998).

In *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 413 (5th Cir. 2003), the court described the PACA as follows:

PACA was enacted in 1930 to regulate the sale of perishable commodities, and "promote fair dealing" in the sale of fruits and vegetables. In 1984, PACA was amended to extend its protection to sellers of perishable commodities, who, because of the need to sell their products quickly, were often unsecured creditors of buyers whose creditworthiness they were unable to evaluate before the sale. To "remedy this burden on commerce in perishable commodities," Congress added the provisions in § 499e, which create, immediately upon delivery, a nonsegregated "floating" trust in favor of sellers on the perishable commodities sold and the products and proceeds derived from the commodities. If the seller is not paid promptly, the trust assets must be preserved and the seller's claims prime those of other secured and unsecured creditors for the full amount of the claim.

Case 2:04-cv-00527-WEC   Filed 07/02/07   Page 37 of 40   Document 119

*Id.* (citations omitted). "The idea behind the PACA trust is to aide the seller to recover proceeds from delinquent purchasers and vests the district courts of the United States with jurisdiction to hear 'actions by trust beneficiaries to enforce payment from the trust . . . .' 7 U.S.C. § 499e(c)(5)." *United Potato Co., Inc. v. Burghard & Sons, Inc.*, 18 F. Supp. 2d 894, 898 (N.D. Ill. 1998).

In its complaint, Brutyn asserts that it was a beneficiary under the PACA statutory trust in the amount of $26,632.50. However, in its reply brief, Brutyn concedes that its PACA trust claim only relates to the last transaction between the parties, that is, invoice #2003384. Thus, Brutyn asserts that the amount of the PACA trust in this case is $9,300.00.

Preservation of trust rights occurs if the seller sends a written notice of intent to preserve trust benefits within 30 days from the date payment is due. 7 U.S.C. § 499e(c)(3). AGCI argues that the PACA Trust Letter, Exhibit 106, was not authenticated and, thus, does not constitute a valid Notice of Trust Preservation. (Br. at 10.) However, defense counsel stipulated that Exhibit 106 could be admitted without the need for authenticating testimony. (Tr. at 807-08.) Such being the case, I am satisfied that the PACA Trust Letter, Exhibit 106, was a valid Notice of Trust Preservation and that Brutyn has a valid claim for enforcement of payment from the PACA trust pursuant to 7 U.S.C. § 499e(c)(5) in the amount of $9,300.00.

Here, there is no question that, upon delivery and acceptance of the tomatoes purchased under invoice #2003384, a statutory trust was created pursuant to the PACA trust provisions. Furthermore, it is undisputed that to date, Brutyn remains a beneficiary of said trust. Such being the case, I am satisfied that Brutyn is owed $9,300.00 from the PACA trust.

Brutyn also argues that the individual defendants, that is, Tony Gagliano, Richard Kolluaf, and Michael Gagliano should be held individually liable for breach of fiduciary duty. To be sure,

38

a PACA trustee (e.g. corporate official or director) has a fiduciary duty to the beneficiaries of the PACA trust and is required to preserve the assets of said trust so that its beneficiaries may recover the money owed to them. As such, "an individual who is in the position to control the [PACA] trust assets and who does not preserve them for the beneficiar[y] has breached a fiduciary duty, and is personally liable." *Hiller Cranberry Prods., Inc. v. Koplovsky*, 165 F.3d 1, 8-9 (1st Cir. 1999) (stating that a trustee "who uses trust assets for any purpose other than repayment of the supplier is liable to the trust beneficiaries [and] [t]his includes use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment for rent, payroll, or utilities.").

However, individual liability under PACA extends only to those "who are in a position to control PACA trust assets, *and who breach their fiduciary duty to preserve those assets*." *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997) (emphasis added); *see also Golman-Hayden Co., v. Fresh Source Produce*, Inc., 217 F.3d 348, 350 (5th Cir. 2000). Here, there is no allegation that any of the individual defendants breached their duty to preserve AGCI's PACA trust such that AGCI has insufficient liquid assets to satisfy its PACA trust liability of $9,300.00. Such being the case, I am satisfied that the individual defendants cannot be held individually liable for the PACA trust claim and they will therefore be dismissed from this action.

**NOW THEREFORE IT IS ORDERED** that judgment shall be entered in favor of plaintiff Brutyn and against defendant Anthony Gagliano Company, Inc. in the amount of $61,748.41 plus costs, pre-judgment interest, and reasonable attorney's fees;

**IT IS FURTHER ORDERED** that defendants Anthony Gagliano, Michael Gagliano, and Richard Kollauf be and hereby are dismissed from this action;

39

**IT IS FURTHER ORDERED** that within ten (10) days of the date of this order, the plaintiff shall file a memorandum in support of its computation of pre-judgment interest and reasonable attorney's fees; the defendant shall have ten (10) days after the date of the plaintiff's filing to file its response to the plaintiff's computation of pre-judgment interest and reasonable attorney's fees; and the plaintiff will have five (5) days after the defendant's filing to file a reply;

**IT IS FURTHER ORDERED** that the plaintiff's memorandum in support of attorney's fees and computation of pre-judgment interest <u>shall not exceed ten (10) pages</u>; the defendant's response <u>shall not exceed ten (10) pages</u>; and the plaintiff's reply <u>shall not exceed five (5) pages</u>. Anything submitted beyond these page limits will be disregarded by the court.

**SO ORDERED** this <u>2nd</u> day of July 2007, at Milwaukee, Wisconsin.


<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

40